The **ESTATE OF Robert W. PEARSON,** by its Co–Administrators, Rebecca **LATTA, Neal W. Pearson and Penny D. Swanson, and the Estate of Mary E. Pearson,** by its Co–Administrators Rebecca Latta, Neal W. Pearson and Penny D. Swanson, Appellees,

v.

**INTERSTATE POWER AND LIGHT COMPANY, f/k/a IES Utilities, Inc.,** an Iowa Corporation, Appellant.

No. 03–1668.

Supreme Court of Iowa.

July 15, 2005.

Stephen J. Holtman and Leonard T. Strand of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, for appellant.

A. John Arenz and Stephen C. Krumpe of O'Connor & Thomas, P.C., Dubuque, and Timothy J. Aiken of Aiken & Scoptur, S.C., Milwaukee, Wisconsin, for appellees.

David R. Schlee and Truman K. Eldridge, Jr., of Schlee, Huber, McMullen & Krause, P.C., Kansas City, Missouri, and Stephen J. Powell and Jim D. DeKoster of Swisher & Cohrt, P.L.C., Waterloo, for amicus curiae American Gas Association.

WIGGINS, Justice.

A jury returned a verdict against a natural gas utility on two wrongful death claims arising from a natural gas explosion. On appeal the utility claims it did not have a common-law duty to warn its customers of the dangers inherent with using its gas, and if it did, the filed-tariff doctrine shields it from liability. The utility also asserts the damages awarded by the jury for loss of parental consortium

and for physical and mental pain and suffering are excessive. Finally, the utility argues the district court erred in entering judgment against it for eighty-five percent of the damages. Because we hold (1) the utility owed a common-law duty to warn its customers of the dangers inherent with using its gas; (2) the filed-tariff doctrine did not shield it from liability; and (3) the damages awarded for loss of parental consortium and for physical and mental pain and suffering were not excessive, we affirm the district court in part. We, however, reverse the district court for entering judgment against the utility for eighty-five percent of the damages and remand the case to the district court to enter judgment consistent with this opinion.

## I. Background Facts and Proceedings.

In the early morning hours of October 29, 1998, Robert and Mary Pearson, a married couple in their sixties, were in bed sleeping when an explosion and resulting fire occurred in their home. Mary died at the scene, and Robert, who had managed to escape the burning house but suffered severe burns to most of his body, died at the hospital approximately seventeen hours after the explosion. The explosion and resulting fire destroyed Robert and Mary's home and the personal property located on the premises.

It is undisputed the explosion had been caused by a faulty piece of brass tubing, known as a cobra connector, connecting the natural gas line to a stove in the basement of the Pearson house. The manufacturer of cobra connectors discontinued production of these connectors in the seventies and has since closed its business.

IES, a seller of electricity and natural gas, provided the natural gas to the Pearson home. The estates' experts testified natural gas as found in the ground con-

tains sulfur compounds. Prior to being put in the pipeline for transportation to Iowa, the gas company, which mines the gas, utilizes a process known as scrubbing to remove the sulfur compounds. However, this scrubbing process does not remove all of the sulfur compounds. Once the gas reaches IES's gate station, IES adds an odorant to the gas known as ethyl mercaptan, a sulfur compound. IES adds the odorant to the gas to alert customers of a gas leak because natural gas is odorless.

Experts from both sides agree sulfur compounds can be corrosive. An expert for the estates testified the synergistic effect of sulfur in the gas and sulfur in the ethyl mercaptan causes a chemical reaction to occur in the phosphorous brazing alloy of the cobra connector. "Synergistic," as used by the expert, means one without the other; they have to work in combination with each other to create the reaction. This chemical reaction causes the brazed joint to corrode and deteriorate. The resulting corrosion and deterioration led to a catastrophic failure of the connector in the Pearson residence and allowed gas to accumulate in the basement. The water heater's pilot light ignited the accumulation of gas causing the explosion and fire.

To support the estates' expert opinions that the sulfur compounds in the gas caused a catastrophic failure of the cobra connector, the estates had the Pearsons' connector examined by an expert in material and metallurgical engineering. The expert examined the connector with a scanning electron microscope and confirmed the connector contained sulfidation corrosion.

IES's experts disagreed with the estates' experts. They testified the gas companies scrub the corrosive sulfur compounds out of the gas before it enters the pipeline. They also testified although ethyl mercaptan is a sulfur-based compound,

it is non-corrosive. They opined the catastrophic failure of the cobra connector had nothing to do with the ethyl mercaptan it added to the natural gas supplied to the Pearson residence, but rather, the design of the connector caused the connector to fail.

IES was aware of the failures attributable to the cobra connectors prior to the explosion at the Pearson home. Apparently, there had been at least two other fatal explosions resulting from failures of cobra connectors in IES's service area prior to the Pearson house explosion. Additionally, IES had received notices from the American Gas Association (AGA) and the Consumer Product Safety Commission as early as 1979. There was testimony at trial that although IES managers issued memorandums to IES employees regarding the dangers of the cobra connectors and the necessity of their identification and removal, IES employees were not trained or required to recognize and remove the cobra connectors from the field when the employees were in the customers' homes. Although IES argues there was no law requiring IES to take action with regard to the connectors located inside its customers' homes, IES voluntarily used public service announcements and warning bulletins stuffed in its bills to warn customers of the dangers of the cobra connectors. The estates' experts opined IES's attempt to warn its customers regarding the dangers of the cobra connectors was inadequate and below the standard of care.

The Pearson's three adult children, Rebecca Latta, Penny Swanson, and Neal Pearson, as co-administrators of their parents' estates, filed this action against IES. The petition, as amended, alleged when IES supplied its natural gas to the house, it knew or should have known its gas posed a risk to its customers when the sulfur compounds contained in the gas came into contact with a cobra connector.

IES moved for summary judgment on several bases. IES first noted it did not design, manufacture, sell, install, or maintain the cobra connector. IES argued it could not be liable for injuries or damages for its failure to warn of the dangers associated with cobra connectors. IES also argued the filed-tariff doctrine shielded it from liability for any injury, loss, or damage resulting from the use of the customer's piping or other equipment. Finally, IES claimed it did not assume a duty to its customers when it made inspections or recommendations solely as a courtesy.

The district court overruled the motion. The case proceeded to trial. At the conclusion of the estates' evidence and again at the close of all the evidence, IES moved for directed verdict on the grounds it raised in its motion for summary judgment. The district court denied the motions. Ultimately, the district court submitted three specifications of negligence for the jury's consideration. They were:

1. [failing] to adequately warn Mary and Robert Pearson of the dangers in connection with the defective Cobra flexible connectors.

2. [failing] to exercise the care which a reasonably careful corporation would use under similar circumstances.

3. [failing] to adequately train its employees to inspect for, recognize, remove, repair, and/or replace the defective flexible connectors.

The district court submitted the case to the jury using a special verdict form requiring the jury to determine whether IES was negligent on each specification. The jury found IES negligent under specifications one and three but found IES was not negligent under specification two. The jury also found IES seventy percent at fault and Robert and Mary each fifteen

percent at fault. The jury awarded damages, before a reduction for fault, as follows:

### Robert's Estate

| | | |
|---|---:|---|
| Pre-death pain and suffering | $ 1,500,000.00 | |
| Present worth of the value of the estate | $ 55,000.00 | |
| Rebecca's loss of parental consortium | $ 505,000.00 | |
| Penny's loss of parental consortium | $ 505,000.00 | |
| Neal's loss of parental consortium | $ 510,000.00 | |
| Burial expense | $ 8,000.93 | |
| Pre-death medical expenses | $ 6,219.31 | |
| One-half value of homestead | $ 37,500.00 | |
| One-half value of vehicles | $ 13,500.00 | |
| One-half value of personal property | $ 13,172.00 | |
| One-half cost of demolition | $ 970.00 | |
| Total | $ 3,154,362.24 | |

### Mary's Estate

| | | |
|---|---:|---|
| Pre-death pain and suffering | $ 250,000.00 | |
| Present worth of the value of the estate | $ 55,000.00 | |
| Rebecca's loss of parental consortium | $ 510,000.00 | |
| Penny's loss of parental consortium | $ 510,000.00 | |
| Neal's loss of parental consortium | $ 540,000.00 | |
| Burial expense | $ 5,691.75 | |
| One-half value of homestead | $ 37,500.00 | |
| One-half value of vehicles | $ 13,500.00 | |
| One-half value of personal property | $ 13,172.00 | |
| One-half cost of demolition | $ 970.00 | |
| Total | $ 1,935,833.75 | |

Based on the verdict, the district court entered judgment in favor of Robert's estate in the sum of $2,681,207.90 and Mary's estate in the sum of $1,645,458.69. The judgments represented a fifteen-percent reduction for each estate's fault.

IES filed post-trial motions requesting a new trial, remittitur, or a judgment notwithstanding the verdict. It also filed a motion to amend or clarify the verdict. These motions not only raised the same issues argued in IES's motion for directed verdict but also raised the issue that the jury verdicts were excessive and required a new trial or remittitur. Finally, the post trial motions alleged the district court's judgment entry did not comply with Iowa Code sections 668.4 and 668.5 (2003).

Subsequent to the filing of the post-trial motions, but before ruling on them, the trial judge became disabled and unable to rule on the motions. The chief judge assigned a successor judge to rule on the motions. After reviewing the real-time record of the trial, the successor judge overruled all of IES's motions. IES appeals.

## II. Issues.

On appeal IES asserts: (1) IES did not owe a duty to warn the Pearsons of the dangers associated with the cobra connector; (2) IES did not owe a duty to train its employees to inspect for, recognize, remove, repair, and/or replace the cobra connector; (3) the damages awarded by the jury were excessive; and (4) the district court erred in entering judgment against IES for eighty-five percent of the damages awarded to each estate.

## III. Analysis.

*A. Did IES owe a duty to warn the Pearsons of the dangers inherent in using its gas with a cobra connector?*

At the conclusion of the evidence, IES moved for a directed verdict on the grounds it did not owe any duty to warn the Pearsons of the dangers associated with a cobra connector. IES raised the same objection to the jury instructions. After the jury rendered its verdict, IES raised this issue in its motion for judgment notwithstanding the verdict. We review a challenge to the jury instructions for correction of errors at law. *Kiesau v. Bantz*, 686 N.W.2d 164, 171 (Iowa 2004). Likewise, we review rulings on motions for directed verdict and for judgment notwithstanding the verdict for correction of errors at law. *Maxim Techs., Inc. v. City of Dubuque*, 690 N.W.2d 896, 900 (Iowa 2005); Iowa R.App. P. 6.4. In reviewing the rulings on the motions for directed verdict and for judgment notwithstanding the verdict, we view the evidence in the light most favorable to the party opposing the motion. *Midwest Home Distrib. v. Domco Indus., Ltd.*, 585 N.W.2d 735, 738 (Iowa 1998); Iowa R.App. P. 6.14(6)(*b* ).

1. *Duty to Warn.* Whether a legal duty existed between the parties is a question of law. *Jain v. State,* 617 N.W.2d 293, 297 (Iowa 2000). We have adopted the Restatement (Second) of Torts concerning the duty to warn by persons providing products for the use of others. *West v. Broderick & Bascom Rope Co.,* 197 N.W.2d 202, 209 (Iowa 1972). The Restatement provides:

> One who supplies directly ... a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388, at 300–01 (1965).[1] Accordingly, IES owed a duty to exercise reasonable care to inform the Pearsons of the dangers involved when the natural gas it supplied came into contact with a cobra connector if IES knew or should have known of the dangers involved, and IES had no reason to believe the Pearsons would realize the dangers. *See Halliburton v. Pub. Serv. Co.,* 804 P.2d 213, 217 (Colo.Ct.App.1990) (holding a supplier of natural gas has a duty to adequately warn its customers of the dangers involved when its natural gas containing corrosive ethyl mercaptan comes in contact with a cobra connector); *Adams v. N. Ill. Gas Co.,* 211 Ill.2d 32, 284 Ill.Dec. 302, 809 N.E.2d 1248, 1262–63 (2004) (same); *Lemke v. Metro. Utils. Dist.,* 243 Neb. 633, 502 N.W.2d 80, 89 (1993) (same).

Viewing the evidence in the light most favorable to the estates, we find it supports that long before the explosion at the Pearson residence, IES knew the sulfur compounds contained in its natural gas had a corrosive effect on the phosphorus brazing alloy used in cobra connectors. IES knew of reports from a California utility that the addition of ethyl mercaptan to the natural gas caused a chemical reaction to occur in the brazing joints of the connector causing the joints to corrode and deteriorate. Additionally, IES also knew these types of connectors were widely used by its customers. IES further knew the deterioration of the brazed joint could lead to a catastrophic failure allowing gas to accumulate in a residence and explode as it did in the Pearsons' residence. There was no evidence indicating the Pearsons knew of the dangers associated with their connector.

---

1. The Restatement (Third) of Torts: Products Liability section 2(c) adopts a similar standard concerning the liability of a commercial seller or distributor for harm caused by a defective product. Section 2(c) provides a product:

> is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

Restatement (Third) of Torts: Products Liability § 2(c), at 14 (1998). We need not decide section two's applicability to this case because the parties tried the case as a negligence case, rather than as a defective product case.

In mid-December 1979, the United States Consumer Product Safety Commission issued a warning regarding the failure of cobra connectors to the AGA. A few days later, the AGA forwarded this warning to its members, which included IES. In November 1980, IES instructed its employees to check the connectors in its customers' homes whenever they were on the customers' premises. If the employee discovered a cobra connector in a customer's home, IES instructed the employee to tell the customer to have the connector replaced.

As early as 1985, IES began to warn its customers of the dangers surrounding the continued use of the connectors through voluntary public service announcements and bulletins stuffed in its bills. The estates presented evidence that these warnings were unreasonable under the circumstances. The estates produced evidence showing other utility companies used methods better calculated to warn their customers of the dangers surrounding the continued use of cobra connectors.

This evidence supports a conclusion that IES had a duty to exercise reasonable care to inform its customers, including the Pearsons, of the dangers inherent in using its gas with a cobra connector, and IES failed to exercise reasonable care to provide the Pearsons with an adequate warning of the dangers.

■ 2. *Filed–Tariff Doctrine.* IES contends even if a common-law duty to warn exists, the plain language of its tariff filed with the regulatory authority bars imposition of a duty in this case under the filed-tariff doctrine. The filed-tariff doctrine precludes actions that attempt to alter the terms and conditions contained in a tariff. *Teleconnect Co. v. U.S. West Communications, Inc.,* 508 N.W.2d 644, 647 (Iowa 1993).

■ IES is subject to the public utility regulations found in Iowa Code chapter 476. "Every public utility shall file with the board tariffs showing the rates and charges for its public utility services and the rules and regulations under which such services were furnished...." Iowa Code § 476.4. The utility company cannot change a rate, charge, schedule, or regulation unless and until it files a tariff with the regulatory authority. *Id.* § 476.6(1). The legislature designed the tariff system to replace private contracting between a utility and its customers. *Teleconnect Co.,* 508 N.W.2d at 647. Terms of service that the parties would ordinarily put into private contracts are included in a utility's tariff. *Id.* at 646. The tariff amounts to a binding contract between the utility and its customers. 64 Am.Jur.2d *Public Utilities* § 61, at 490 (2001). Once a utility files a tariff with the regulatory authority, it has the force and effect of law. *Woodburn v. N.W. Bell Tel. Co.,* 275 N.W.2d 403, 405 (Iowa 1979); *Coon Valley Gravel Co. v. Chi., R.I. & P.R. Co.,* 241 Iowa 487, 489, 41 N.W.2d 676, 677 (1950).

■ The purpose of the tariff is to ensure uniformity of utility rates and prevent a utility from discriminating based on price or service. *Teleconnect Co.,* 508 N.W.2d. at 646. A utility can limit its liability in its tariff. *See Woodburn,* 275 N.W.2d at 405 (rejecting the plaintiff's public policy argument and upholding the limit of liability section of a tariff as it relates to a white-page listing). A tariff, however, does not preclude all actions based on state law. *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,* 524 U.S. 214, 230–31, 118 S.Ct. 1956, 1966–67, 141 L.Ed.2d 222, 238 (1998) (Rehnquist, C.J., concurring). A tariff can only limit the liability of a utility if the limitation is within the tariff's ambit. *See Woodburn,* 275 N.W.2d at 405 (allowing the plaintiff to proceed on

his claim dealing with a yellow-page listing because yellow-page listings were not covered by the phone company's tariff); *accord State Farm Fire & Cas. Co. v. S. Bell Tel. & Tel. Co.*, 245 Ga. 5, 262 S.E.2d 895, 897 (1980) (holding tariff limiting a general claim for failure to provide telephone service does not preclude a state claim arising out of the utility's alleged negligence); *Nat'l Food Stores, Inc. v. Union Elec. Co.*, 494 S.W.2d 379, 384 (Mo.Ct.App.1973) (holding a tariff fixing a utility's liability for interruption of service did not preclude a state action based on the utility's failure to give notice to a consumer prior to a known interruption); *Kroger Co. v. Appalachian Power Co.*, 244 Va. 560, 422 S.E.2d 757, 759 (1992) (holding tariff purporting to shield a utility from all liability in providing power to a customer beyond the delivery point does not shield the utility from the common-law duty not to reenergize a customer's lines when it knows the lines located beyond the delivery point are defective).

IES points to specific provisions in its tariff to support its position the plain language of its tariff filed with the regulatory authority bars imposition of a duty in this case. Section 4.06 provides: "[a]ll piping and equipment on customer's side of the point of delivery, except metering equipment, shall be installed and maintained at the customer's expense in a manner approved by the public authorities having jurisdiction over the same." Section 4.07 of the tariff provides IES has no duty to inspect the piping and equipment beyond the outlet of IES's gas meter, and it has no liability for any injury, loss, or damage resulting from the use of the customer's piping or other equipment. Section 5.04 of the tariff states IES "shall in no way be liable because of any inspections or recommendations by company which are made solely as a courtesy by company to customer."

The estates point to other provisions in the tariff supporting its position that the tariffs do not preclude IES's liability for a failure-to-warn claim. Section 15.01 of the tariff states: "[t]he safety of employees and the public must receive first priority." Mirroring the words of the applicable administrative rule, section 15.02 of the tariff provides: "[e]ach company representative shall exercise reasonable care to minimize any hazard inherent in connection with company's gas service and to which its employees, customers, and the general public may be subjected."

■■■■■ To determine whether the tariff bars a tort action based on the breach of the common-law duty to warn, we must construe the tariff. We construe a tariff according to the same rules as contracts. *See Coon Valley Gravel*, 241 Iowa at 489–91, 41 N.W.2d at 678–79 (applying the rules of construction applicable to contracts to construe a tariff); *accord* 64 Am. Jur.2d *Public Utilities* § 61, at 490 (stating, "tariffs are interpreted no differently than any other contract"). In construing a written contract, "the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." Iowa R.App. P. 6.14(6)(*n*). We construe a contract in its entirety by considering all of its pertinent provisions. *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997). We assume no part of the contract is superfluous or of no effect and a construction giving meaning to all its clauses is preferred. *Kerndt v. Rolling Hills Nat'l Bank*, 558 N.W.2d 410, 416 (Iowa 1997). If a tariff is ambiguous, we strictly construe the language of a tariff against the drafter, the utility. *Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 811 (9th Cir.1982); *Penn Cent. Co. v. Gen. Mills, Inc.*, 439 F.2d 1338, 1341 (8th Cir.1971). A

strict construction against a tariff's drafter is not justified when the construction would ignore a permissible and reasonable construction that conforms to the intentions of the framers of the tariff. *Penn Cent. Co.*, 439 F.2d at 1341. Any ambiguity created by the incorporation of seemingly contradictory clauses must be resolved against the drafter of the contract. *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 375 (8th Cir.1983).

▮ This rule of strict construction, however, does not apply if a strict construction of the tariff has the effect of discriminating based on price or service. *Bradshaw v. Wilkinson Water Co.*, 94 P.3d 242, 247 (Utah 2004). In the present case, allowing the estates to keep their verdicts under a strict construction of the tariff would not be discriminatory as to other IES customers. *Adams*, 284 Ill.Dec. 302, 809 N.E.2d at 1268 (holding "awarding damages on plaintiff's claim [for the gas company's failure to warn of the dangers when its natural gas came in contact with a cobra connector] would neither discriminate against other [gas company] customers nor involve the court in tariff setting"); *see also Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 300, 96 S.Ct. 1978, 1985, 48 L.Ed.2d 643, 652 (1976) (stating "any impact on rates that may result from the imposition of tort liability or from practices adopted by a carrier to avoid such liability would be merely incidental"); *Lovejoy v. AT & T Corp.*, 92 Cal.App.4th 85, 111 Cal.Rptr.2d 711, 723 (2001) (stating "awarding damages for [the tortious conduct pled] would neither involve the court in tariff setting nor enforce discrimination against other AT & T customers").

Section 15.02 of the tariff requires the utility to exercise reasonable care to minimize *any hazard* inherent in the gas services it provides its customers. A recognized method of minimizing a hazard is to warn the ultimate user of the hazard. By its terms, section 15.02 incorporates the utility's common-law duty to warn its customers of the dangers inherent with using its gas. A plain reading of sections 4.06, 4.07, and 5.04 of the tariff leads us to believe these sections only cover liability for inspections and/or defects in the pipes on the customer's side of the point of delivery, not for a failure to warn its customers of any hazard inherent in its gas service. Even if we assume IES is correct, and sections 4.06, 4.07, and 5.04 of the tariff cover all situations involving the pipes on its customer's side of the point of delivery, the tariff is silent as to the duty to warn and in conflict with section 15.02 requiring IES to minimize any hazard inherent in the gas services it provides its customers. Accordingly, IES's choice of language causes us to conclude the tariff did not preclude the estates' claims on IES's common-law duty to warn the Pearsons of the dangers inherent with using its gas.

▮ Lastly, IES argues section 5.12 entitled, "Indemnity to Company," precludes liability for breach of any duty to warn the Pearsons of the dangers inherent with using its gas. Section 5.12 states:

Customer shall indemnify, hold harmless and defend company against all claims, demands, costs or expenses for injury to persons or loss or damage to property, in any manner directly or indirectly connected with, or growing out of the distribution or use of gas service by customer at or on customer's side of the point of delivery.

The common meaning of "indemnify" is "to reimburse (another) for a loss suffered because of a third party's or one's own act or default." *Black's Law Dictionary* 783–84 (8th ed.2004). "Hold harmless" is synonymous with "indemnify." *Id.* at 749. IES's use of these words clearly indicates

the intent of section 5.12 was to protect IES from claims brought by third parties, not those of a customer. *See Wallerstein v. Spirt,* 8 S.W.3d 774, 779–80 (Tex.Ct.App. 1999) (discussing the characteristics of an indemnity agreement). Therefore, section 5.12 does not shield IES from liability for its failure to warn the Pearsons of the dangers inherent with using its gas.

In answering the special verdict form, the jury also found IES negligent for its failure "to adequately train its employees to inspect for, recognize, remove, repair, and/or replace the defective flexible connectors." IES claims the tariff precluded the jury from finding it negligent under this specification. Even if IES is correct in its assertion, we need not address IES's claim regarding the inadequate training specification because the special verdicts rendered by the jury were sufficiently insulated from each other to allow the jury's finding on the warning claim to stand on its own. *Olson v. Prosoco, Inc.,* 522 N.W.2d 284, 292 (Iowa 1994).

*B. Were the damages awarded by the jury excessive?*

 We review the district court's denial of a motion for a new trial based on the claim a jury awarded excessive damages for an abuse of discretion. *State v. Taylor,* 689 N.W.2d 116, 133–34 (Iowa 2004). Normally, we accord weight to the fact the trial judge saw and heard the witnesses, observed the jury, and had before it all the incidents of trial before ruling on a motion for a new trial. *Kautman v. Mar/Mac Cmty. Sch. Dist.,* 255 N.W.2d 146, 147–48 (Iowa 1977). This case is unique because the judge who heard the evidence was unable to rule on the post-trial motions due to his disability. Our rules of civil procedure provide when a judge becomes disabled before ruling on post-trial motions, the successor judge should review the transcript and render a decision on the motions. Iowa R. Civ. P. 1.1802(2). The intent of the rule is that the ultimate decision on the motions is the decision of the successor judge. *Hunter v. Union State Bank,* 468 N.W.2d 456, 458 (Iowa 1991). The successor judge in this case noted in his ruling on the post-trial motions, "I did not have the opportunity to observe and listen to the witnesses. It is not my intent to act as an appellate court."

 Under this unique circumstance, we will not give the successor judge's ruling the weight we normally accord a judge who heard the evidence. In reviewing the motion for new trial, "[w]e view the evidence in the light most favorable to the verdict and need only consider the evidence favorable to plaintiff whether it is contradicted or not." *Olsen v. Drahos,* 229 N.W.2d 741, 742–43 (Iowa 1975).

 IES claims the damages awarded for loss of parental consortium and predeath physical and mental pain and suffering were excessive. The determination of damages is traditionally a jury function. A jury's assessment of damages should be disturbed "only for the most compelling reasons." *Rees v. O'Malley,* 461 N.W.2d 833, 839 (Iowa 1990). We will set aside or reduce a jury award only if it

(1) is flagrantly excessive or inadequate; or (2) is so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is a result of passion, prejudice or other ulterior motive; or (4) is lacking in evidentiary support.

*Id.* In our determination, we put the most emphasis on whether there is evidentiary support for the verdict. *Id.* "If the verdict has support in the evidence the others will hardly arise, if it lacks support they all may arise." *Id.*

 1. *Damages for Loss of Parental Consortium.* The loss of parental

consortium includes "the intangible benefits of companionship, comfort, guidance, affection, and aid of the parent in every parental relationship," and "the tangible benefits of general usefulness, industry, and attention within the home and family, but does not include the value of tangible contribution or loss of monetary support from the injured parent." *Gail v. Clark,* 410 N.W.2d 662, 668 (Iowa 1987). We have recognized a difference between proof of the fact a person sustained damages and proof of the amount of those damages. *Orkin Exterminating Co. v. Burnett,* 160 N.W.2d 427, 430 (Iowa 1968). "If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Id.* Damages for loss of consortium are incapable of precise pecuniary measurement by the witnesses. Consequently, they are left to the sound discretion of the jury.

Our review of the record reveals Robert and Mary Pearson had a very close relationship with each of their children. All the Pearson children were in their thirties when their parents died. The Pearsons and their children spent almost every major holiday together. Rebecca and Neal lived in the town of Lone Tree with their parents. Rebecca's residence was a short distance from that of her parents. Over the years Rebecca was married, a week did not go by when Rebecca and her family did not have at least one meal at the Pearson home. Rebecca and her family usually spent their Sundays at the Pearson residence. Robert and Mary played a significant role in the development of Rebecca's children.

Neal saw his parents almost every day. Although Neal and Robert had separate trucking businesses, they both were in the same line of work. On weekends, Neal and his father would spend time washing their trucks, changing their oil, and getting their trucks ready for the next week's work. They were constant companions. When Neal's first wife died, Mary and Robert stepped in to help care for Neal and Neal's three small children. Mary cooked, cleaned, shopped, and watched the children. Mary took early retirement the summer before the explosion just so she could spend more time taking care of Neal's children. Neal's children often spent their evenings with the Pearsons and received advice and guidance from them. Neal has remarried but his second wife has been diagnosed with cancer. At the time of their death, Mary and Robert were providing some of the same guidance and child rearing help for Neal's three stepchildren.

Within several years of the explosion, Penny had been living in her parents' home. Although Penny lived in a different city from her parents at the time of the explosion, Penny talked to her parents almost every day. Robert and Mary provided invaluable guidance, advice, and counseling to Penny. Prior to the explosion, Penny recently married. She and her husband assumed custody of Penny's two stepdaughters. Penny and her family frequently returned to the Lone Tree area because that is where all of the stepdaughters' relatives lived. Robert and Mary would make trips to Council Bluffs two to three times a year to spend time with Penny and her family.

Although the awards for loss of parental consortium are sizeable, the awards are neither lacking in evidentiary support nor flagrantly excessive. The successor judge did not abuse his discretion by overruling IES's motion for a new trial or remittitur.

2. *Damages for Pain and Suffering.* The estates are entitled to recover damages for the physical and mental

pain and suffering incurred by the Pearsons from the time of injury to the time of death. Physical pain and suffering includes bodily suffering, sensation, or discomfort. *Brant v. Bockholt*, 532 N.W.2d 801, 804 (Iowa 1995). Mental pain and suffering includes mental anguish, anxiety, embarrassment, loss of enjoyment of life, a feeling of uselessness, or other emotional distress. *Id.* Damages for physical and mental pain and suffering cannot be measured by any exact or mathematical standard and must be left to the sound judgment of the jury. *Schnebly v. Baker*, 217 N.W.2d 708, 725 (Iowa 1974), *overruled on other grounds* by *Franke v. Junko*, 366 N.W.2d 536, 540 (Iowa 1985).

Our review of the evidence reveals the explosion and resulting fire occurred at 2:30 a.m. Robert arrived at the hospital at 4:15 a.m. and died at 7:45 p.m. He lived for approximately seventeen hours after the explosion. Immediately after the explosion, Robert sought the help of his neighbor by pounding on his neighbor's door. The neighbor, a physician, observed Robert in a tremendous amount of pain and with all of his hair burned off. The neighbor discovered bloody prints and some skin around the back of his house that had come from Robert's body.

The first emergency medical technician on the scene observed that Robert's hands and feet were bloody and shredded. The technician confirmed the fire burned off all of Robert's hair. The technician noted Robert's skin was a brown-green color. While attempting to take a history from Robert, the technician noticed he was in extreme pain and was having trouble breathing. The technician also noted Robert was keenly aware of his surroundings and knew what was going on. At one point when the technician was trying to determine the status of Robert's condition, Robert made the comment "Oh, damn, I'm still here."

At the hospital, his nurse remembered Robert was alert and responsive. Robert suffered burns on eighty-three percent of his body surface. The only treatment attempted at the hospital was an effort to control his pain and sedate him. Robert's physicians gave him the choice of "comfort care" or "aggressive care." After finding out his wife, his lifetime companion, had not survived and he would not be able to do his daily activities, Robert chose not to fight for survival and opted for "comfort care." At the hospital, he kept mouthing the name "Mary."

The authorities found Mary's body on the first floor of her home by the garage door. This location was several rooms over from their bedroom, where she had been sleeping at the time of the explosion. This evidence indicates Mary lived for a time after the explosion and was attempting to escape the fire in the home before she died. The record is unclear as to whether she died due to the inhalation of smoke or other toxic chemicals created by the fire, by going into shock from her burn injuries, or a combination of both. In any event, any of these causes of death would be terribly painful from a mental and physical standpoint.

The awards for physical and mental pain and suffering are neither lacking evidentiary support nor excessively flagrant. The trial court did not abuse its discretion in failing to enter an order for a new trial or remittitur.

*C. Did the district court err in entering judgment against IES for eighty-five percent of the damages awarded to each estate?*

The jury determined Robert and Mary were each fifteen percent at fault, and IES was seventy percent at fault.

When the district court entered its judgment in favor of Robert's estate, it entered judgment against IES for eighty-five percent of each item of damage awarded. The district court made the same calculation in the judgment it entered in favor of Mary's estate. IES argues the district court erred in entering judgment against it for eighty-five percent of the damages because Iowa Code section 668.4 requires "a defendant found to bear fifty percent or more of fault shall only be jointly and severally liable for economic damages and not for any noneconomic damage awards."

Section 668:4 sets forth the rule of joint and several liability applicable to actions governed by our comparative fault act. Iowa Code § 668.4. The rule of joint and several liability applies when two or more tortfeasors' actions combine to cause a plaintiff's injuries. *Rozevink v. Faris*, 342 N.W.2d 845, 847 (Iowa 1983). Prior to the adoption of our comparative fault act, the common-law rule required each joint tortfeasor to be jointly and severally liable for a plaintiff's entire loss. *Id.* at 850, *modified in part by statute as stated in Johnson v. Junkmann*, 395 N.W.2d 862, 867 (Iowa 1986). Our comparative fault act modified the common-law rule and provides:

> In actions brought under this chapter, the rule of joint and several liability shall not apply to defendants who are found to bear less than fifty percent of the total fault assigned to all parties. However, a defendant found to bear fifty percent or more of fault shall only be jointly and severally liable for economic damages and not for any noneconomic damage awards.

Iowa Code § 668.4.

The parties agreed to submit this case so the combined fault of the parties totaled one hundred percent, rather than as two separate causes of action joined in one action. *See* Iowa R. Civ. P. 1.232 (allowing any number of plaintiffs to join in a single action as long as each plaintiff's cause of action arose out of the same transaction or occurrence). The effect of submitting the case in this manner was to submit the case as though there were two tortfeasors whose actions combined to cause each estate's damages. IES and Robert's estate were the tortfeasors in Mary's estate's cause of action, while IES and Mary's estate were the tortfeasors in Robert's estate's cause of action. Under the submission as agreed to by the parties, section 668.4's rule of joint and several liability is applicable to this action. IES is jointly and severally liable for eighty-five percent of the economic damages because the jury assigned IES with more than fifty percent of the total fault assigned to the parties. IES, however, is only responsible for seventy percent of the noneconomic damages awarded by the jury.

Consequently, the district court properly entered judgment against IES for eighty-five percent of the economic damages, which include the present worth of the value of the estates, the burial expenses, the predeath medical expenses, the value of the homestead, the value of the vehicles, the value of the personal property, and the cost of demolition. Conversely, the district court should have entered judgment against IES for only seventy percent of the noneconomic damages, which include the awards for predeath pain and suffering and the losses for parental consortium.[2]

IES also asserts because the jury found each of the estates fifteen percent at fault for the other estate's damages, the

2. The estates conceded in their brief that the damages awarded to the estates for loss of parental consortium under the evidence introduced at trial were noneconomic losses.

district court should have offset the judgment entered against IES in favor of Mary's estate in an amount equal to the fifteen percent of economic damages awarded by the jury to Robert's estate. It also contends the district court should have made the same calculation in regards to the damages awarded to Robert's estate. The effect of this calculation would be to enter a judgment for contribution against each estate for the extra fifteen percent of economic damages IES is required to pay under section 668.4 of the Code. This assertion is without merit.

IES never asserted a counterclaim against either estate for contribution. If we were to allow a reduction in damages as asserted by IES, we would in essence be allowing an unpled counterclaim by IES against the other estate for contribution. If IES wanted to assert a counterclaim for contribution in this proceeding, it should have done so in its pleadings. This would have given each estate notice of the counterclaim, the opportunity to raise any affirmative defenses, and the opportunity to defend the counterclaim on its merits.

Even if we were to allow IES's unpled counterclaim for contribution, our rules do not allow judgments on counterclaims to offset each other without an agreement of the parties or unless required by statute. *See* Iowa R. Civ. P. 1.957 (stating "[a] claim and counterclaim shall not be set off against each other, except by agreement of both parties or unless required by statute"). Accordingly, the district court was correct when it refused to reduce the amount of the judgment in favor of each estate as requested by IES.

## IV. Disposition.

We affirm the district court in part because IES owed a common-law duty to warn the Pearsons of the dangers inherent with using its gas, and the damages awarded for loss of parental consortium and for physical and mental pain and suffering were not excessive. We, however, reverse the district court for entering judgment against the utility for eighty-five percent of the noneconomic damages and remand the case to the district court to enter judgment consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED TO THE DISTRICT COURT WITH INSTRUCTIONS.**