**IN THE COURT OF APPEALS OF IOWA**

No. 21-1076
Filed August 31, 2022

**BRIAN L. WATTERS and KAREN R. WATTERS,**
 Plaintiffs-Appellants,

**vs.**

**JEFFREY V. MEDINGER,**
 Defendant-Appellee.
_____

Appeal from the Iowa District Court for Jackson County, John Telleen,

Judge.

Plaintiffs appeal the denial of their motion for a new trial. **AFFIRMED.**

Susan M. Hess of Hammer Law Firm, PLC, Dubuque, for appellants.

Joel T.S. Greer of Bradshaw, Fowler, Proctor & Fairgrave, P.C.,

Marshalltown, for appellee.

Considered by Vaitheswaran, P.J., Ahlers, J., and Mullins, S.J.*  Greer, J.,

takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**MULLINS, Senior Judge.**

Brian and Karen Watters (collectively plaintiffs) appeal the denial of their motion for a new trial following a jury verdict on their claims against Jeffrey Medinger stemming from erosion on the plaintiffs' property allegedly caused by Medinger.

**I.      Background Facts and Proceedings**

The plaintiffs have owned a particular tract of agricultural property since 2002, some of which they farm themselves and some of which they rent out.  The property contains several "waterways" that facilitate erosion control.  In 2008, adjoining property was deeded to Medinger.  This litigation involves three waterways on the plaintiffs' property as outlined in yellow in the following image:



From left to right, they will be referred to as the west, main, and east waterways. While the west and east waterways are part of this litigation, the main waterway is its central focus.

According to Brian's testimony, Medinger constructed a drainage system in 2010 that collected water from his property and "dumped it directly onto [plaintiffs']

property," apparently in the vicinity of the east waterway. In 2015, however, Medinger cut the system back so that it drains onto his own property. There is not any evidence that this drain tile caused any meaningful problems on the plaintiffs' property.

Also in 2015, Medinger constructed a cattle shed on his property just north of the main waterway, which included the addition of a catch basin connected to a drainage tile that leads to the main waterway on the plaintiffs' property. According to Brian, the project also involved the filling in of dirt that caused a drainage slope toward plaintiffs' property. Brian testified there was no erosion in this area prior to the erection of the cattle shed, but the erosion to the main waterway has gotten worse ever since it was built. Brian estimated an erosion ditch now extends roughly 800 feet into the field located on his property.

Brian testified, beginning in 2016, the plaintiffs contacted various county officials about the erosion. After receiving no assistance, the plaintiffs contacted the National Resources Conservation Service (NRCS). Two representatives visited the location, determined the main waterway was in compliance, and opined any dispute was a civil matter between the parties. As a result, the plaintiffs initiated this lawsuit against Medinger in 2017.[1] Their initial petition forwarded a claim of negligence and a request for injunctive relief. An amended petition added claims of trespass and nuisance.

---

[1] As was frequently referenced during trial, this is not the first bout of litigation between the parties. The plaintiffs launched a quiet-title action against Medinger in 2008, which culminated in this court, over a dissent, affirming the district court's award of title by acquiescence to Medinger. *See generally Watters v. Medinger*, No. 10-0090, 2010 WL 4807554 (Iowa Ct. App. Nov. 24, 2010).

The plaintiffs' expert, Dennis Waugh, first observed the property in April 2018. His initial observations of the main waterway were as follows: "There had been some severe erosion on the ground owned by the Watterses below the Medinger building site, which was primarily a cattle confinement operation that drained to this particular location that the erosion was at." In his June 11 report following this site visit and his review of historical aerial topography mappings, Waugh opined:

> 1. The ground conditions that generate storm water runoff have significantly changed since 2008 to produce additional runoff onto the Watters property. These changes included changes by grading and a decrease of pervious ground surface condition.
> 2. The quantity and the peak rate of storm water runoff was further increased by the construction of a shed building in 2015, despite attempts to mitigate the increase in runoff by creating a runoff detention effect by the installation of a control catch basin on the north side of the building with an 8" pipe.
> 3. The manner of discharge onto the subservient downstream property was substantially changed by converting wide, shallow, low velocity overland flow into a concentrated plume of higher velocity water exiting a pipe with no method of velocity energy dissipation.
> 4. A proposed catch basin built integrally with a retaining wall along the southerly edge of the building site will not provide any relief to the cause of erosion and is very likely to exacerbate the erosion causes by capturing and concentrating more surface runoff water.
> 5. The increases in quantity, peak flow, and manner of discharge have caused significant erosional damage to the downstream property.
> 6. There are construction remedies available to restore the damage property to its previous conditions, which have been historically stable prior to 2008.[2]

Waugh came to three proposed remedies to alleviate the issues in the main waterway: (1) divert the flow from the catch basin to the north, (2) repair the

---

[2] Waugh authored a supplemental report in December 2018 to address the viability of modifications proposed by Medinger to remedy any concerns.

downstream swale and construct a flow channel resistant to the velocities of the overland surface flows, and (3) utilize a stilling well energy dissipator.

As of April 2021, Medinger had made modifications to his property. Waugh again visited and authored another report "address[ing] the effects of the alternate remedies installed compared to those recommended in the previous two reports." Overall, his supplemental conclusions were as follows:

> 1. Changes [to] the manner of discharge on the servient property by grading has concentrated the overland flow, resulting in the unnatural development of ditches that did not exist prior to the concentration of flow. Construction of an open guardrail fence and concrete block energy dissipation structure has mitigated some damage which now appears stable.
> 2. Modification of the existing catch basin on the north side of the shed and creating a detention pond which flows to a recently constructed "U" shaped concrete block retaining wall energy dissipation structure has mitigated most of the damage due to the concentrated flow from the 8" pipe and is nearly as effective as redirection of the flow to the north; however the previous damage to the subservient property has not been repaired or restored to its previous stable condition.

So Waugh concluded "previously recommended remedies 1 and 3 have effectively been implemented," but "Remedy 2, repair of the downstream drainage swale on the Watters property has not been implemented." Medinger's expert engineer, Richard Ransom agreed the modifications Medinger made to his property remedied the drainage problems and opined nothing else needed to be done.

Waugh's foregoing involvement was apparently limited to the main waterway. Brian testified that, in 2020, Medinger did more construction on his property that involved a third drainage tile being installed that had an outlet a few feet from the plaintiffs' property, apparently in the area of the west waterway. Brian explained he noticed additional erosion in that area by the time of trial. However,

Brian agreed a natural drainage runoff was already established in this area, and erosion was already present in the area prior to installation of the tile. According to Brian, Medinger connected another tile in 2021 that discharged onto the plaintiffs' property.

In June 2021, Waugh again visited the property "to observe conditions that have been created by the installation of a different drain tile than has been the subject of previous reports," i.e., the tile leading to the west waterway, allegedly installed in 2020. Waugh was unable to conclude whether this tile caused any erosional effects, but he opined it could exacerbate and accelerate erosion. No evidence was presented by the plaintiffs about the condition of the east waterway. Medinger testified he installed a sediment basin in that area in or about 2007 or 2008 and he has not been made aware of any problems with it since.

In 2019, the plaintiffs initially contacted local contractor Steve Klocke about repairing the main waterway. Klocke submitted a basic estimate in the amount of $6850.00. If the work was to include erosion blankets and seeding, it would cost $18,631.58. However, the plaintiffs did not pursue this bid any further. Paul Steger—owner, project manager, and estimator of a construction company—was contacted by the plaintiffs in 2021 to submit a bid to complete the repairs. He visited the plaintiffs' property shortly before trial. He examined the three eroded areas allegedly caused by Medinger, which are outlined in yellow in the image above. Given "how extreme the erosion was and how deep the ditch had washed," Steger testified repairing the area would "take more than traditional means and methods." All in all, Steger estimated the cost for repairs would be $94,636.00.

This figure would include mobilizing equipment to Maquoketa from Dyersville and back, grading, installing turf reinforcement mats and ditch checks, and seeding.

Dennis "Doc" Bradley owns a tiling company and has done some of the tiling work on Medinger's property. He also has experience in waterway repair and testified to his experience with the bidding process for waterway repair among contractors in the area. Bradley submits his bids pursuant to NRCS rules, which contemplate $1.00 per foot of waterway for moving dirt, pounds of seeding per acre, and $1.00 per foot of check strips. Assessing the main waterway on the plaintiffs' property, which is roughly 800 feet long, Bradley estimated the cost for repairing that waterway "would be about $2,000," but other bidders might come to estimates in the neighborhood of $3500.00. Bradley's bid would "include getting machinery there, doing the job, seeding it, check stripping it and everything." In evaluating Steger's estimate, Bradley testified: "I cannot believe somebody would even bid a job that high." Bradley added, the work could be completed in "[a] ten-hour day."

In his testimony, Medinger explained the ragweed in the main waterway, as shown in exhibits, was essentially a contributory cause of the erosion, beginning in about 2010 and worsening year after year. He specified the ongoing uncontrolled presence of ragweed, which gets larger year after year, prevents the growth of grass, which in turn allows the ragweed to loosen the soil and make it more susceptible to erosion. So Medinger basically took the position that the erosion was caused by the plaintiffs' lack of maintaining the waterways over the years. In his rebuttal testimony, Brian responded that maintaining the waterways was the responsibility of tenants, and the waterways always complied with United

States Department of Agriculture standards. He also testified there is no ragweed in the waterways. While he agreed horseweeds were present, he submitted they were generally mowed every fall. He agreed, however, that the plaintiffs have not been able to mow the main waterway since 2015.

As a result of the erosion to the main waterway, the plaintiffs added a culvert to facilitate traversing the area, and they have frequently moved fences. The farmer who rented this portion of the plaintiffs' property from 2015 to 2019, Alan Schroeder, however, testified he never had any problems with traversing the area despite the erosion in the main waterway, and he never had any problems whatsoever with the east and west waterways. Alan's son, Brad Schroeder, who farmed the land with Alan and also owns an excavating business, testified as follows concerning the main waterway when they first started farming the ground in the spring of 2015: "There was quite a bit of erosion, weeds growing. It was in tough shape." He added the other waterways "were in equal condition." Brad spent about three or four days bulldozing the waterways "so they were crossable." When asked about the condition of the waterways in the fall of 2019—the last time the Schroeders harvested the crops on the land they rented from the plaintiffs— as compared to the spring of 2015, Brad testified: "I would say they were in similar condition, similar shape. No better or worse."

During the preparation of jury instructions following the close of evidence, plaintiffs' counsel objected to the inclusion of instructions on comparative fault, simply asserting, "I don't believe that . . . the comparative fault instruction should be given." Defense counsel responded plaintiffs' failure to mitigate was an issue so comparative fault was in play. The court overruled the plaintiffs' objection.

In its verdict, the jury found for Medinger on the plaintiffs' nuisance and trespass claims. As to negligence, the jury found both parties at fault, assigning 90% of fault to plaintiffs and 10% of fault to Medinger, with only the plaintiffs' fault causing any damages. The jury found the plaintiffs suffered $2000.00 in damages as a result of the total fault of the parties. As a result, the court entered judgment in favor of Medinger. *See* Iowa Code § 668.3(1)(a) (2017) (barring recovery of damages for injury to property when "the claimant bears a greater percentage of fault than the combined percentage of fault attributed to the defendants").

The plaintiffs filed a motion for a new trial, in which they argued "[t]he damages set forth in the verdict bear no relationship to the evidence and the burden of proof that the plaintiffs met," Medinger "did not submit sufficient evidence of any fault by plaintiffs," thus making an instruction on comparative fault inappropriate, and the evidence showed mitigation of damages by repair during the litigation would have been fruitless. As an alternative to granting a new trial, plaintiffs requested an additur in line with Steger's estimate.

Medinger resisted. On the issue of comparative fault, he submitted "[t]he jury heard ample evidence about [the plaintiffs'] failure to maintain their own waterways, especially the largest one, which was in poor condition the summer of 2015 before [Medinger] built his barn and affected any water flow." Medinger also noted the plaintiffs' expert's failure to come up with a solution during the litigation thus amounted to a failure to mitigate damages. As to the adequacy of damages, Medinger highlighted testimony from various witnesses about how inexpensive it would be to repair the waterways, in comparison to Steger's estimate nearing six figures. He also noted there was insufficient evidence to show he caused any

damage to the east and west waterways, and testimony was presented that the main waterway could be repaired for as little as $2000.00, the amount of damages the jury ultimately reached. He finally submitted the jury was free to reject Steger's estimate as an extreme outlier.

Ultimately, the court denied plaintiffs' motion for a new trial "for the reasons set forth in defendant's resistance." The plaintiffs now appeal.

## II. Standard of Review

We review the denial of a motion for a new trial claiming error in the jury instructions for errors at law. *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892 (Iowa 2015). The denial of motion for a new trial on the basis that the award was inadequate or the verdict is not sustained by sufficient evidence is reviewed for an abuse of discretion in consideration of "the particular facts of the case." *Fisher v. Davis*, 601 N.W.2d 54, 57 (Iowa 1999); *accord Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 162 (Iowa 2004).

## III. Analysis

### A. Jury Instruction

We begin with the plaintiffs' challenge to the jury instruction on comparative fault. The plaintiffs argue a new trial is warranted under Iowa Rule of Civil Procedure 1.1004(8) because "the district court made an error at law by giving a comparative fault instruction to the jury as it was not supported by the evidence." They argue there was no substantial evidentiary support for a comparative fault instruction because the involved experts agreed it would not have done any good to repair the waterways until the drainage issues were resolved, and the plaintiffs' following that advice does not amount to a failure to mitigate damages.

A district court cannot instruct on "an issue having no substantial evidential support or which rests on speculation." *Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997) (citation omitted). Evidence is substantial when it is adequate to allow a reasonable person to reach a particular conclusion. *Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 326 (Iowa 1996). In determining whether the evidence supporting an instruction is substantial, we give the most favorable construction possible to the party urging submission. *Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 108 (Iowa 1986).

The problem with the plaintiffs' argument is that they focus entirely on their position that their failure to mitigate was reasonable based on the expert opinions. What the plaintiffs do not meaningfully address is the evidence about how their failure to maintain the waterways was a potential contributing factor to the erosion problems and resulting damages. While the plaintiffs themselves testified they maintained their waterways, there was certainly conflicting evidence on that issue. For starters, as to the main waterway, Brian testified there were no erosion problems in that area until after Medinger built his cattle shed in 2015. Yet, one of the farm tenants testified that waterway was already in a dismal condition in the spring of 2015 when he began farming it: "There was quite a bit of erosion, weeds growing. It was in tough shape." He later specified the weeds were ragweed. He also stated he did not mow the weeds and opined, based on the amount of them, neither did the plaintiffs. Medinger later provided testimony on the negative effect that an ongoing ragweed infestation can have on the integrity of the soil in the waterway, thus making it more susceptible to erosion. Turning to the east and west waterways, there was no meaningful evidence presented that Medinger's

actions caused erosion in those areas. Even if there was, the tenant testified those waterways "were in equal condition" to the main waterway when he began farming the ground.

By statute, fault means "one or more acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others," and includes "unreasonable failure to avoid an injury or to mitigate damages." Iowa Code § 668.1(1). A comparative fault instruction would be appropriate upon a showing of "a causal connection between [plaintiffs'] fault and [their] claimed damages." *Ransdell v. Huckleberry Ent., LLC*, No. 19-0545, 2020 WL 5650728, at *7 (Iowa Ct. App. Sept. 23, 2020). While it is true that there is no real dispute that Medinger's actions contributed to erosion, at least in the main waterway, giving the most favorable construction possible to support giving the instruction, there was adequate evidence to allow a reasonable jury to determine that the plaintiffs' historical failure to maintain their waterways also contributed to their damages. As such, the utilization of a comparative fault instruction was supported by substantial evidence, and it would have been error to not instruct the jury on it. *See Hoekstra*, 382 N.W.2d at 107–08. We affirm on this issue.

B. Damages

Next, the plaintiffs argue "[t]he damages awarded in the verdict bear no relationship to the evidence." So they submit a new trial was warranted under rule 1.1004(4) for inadequacy of damages, (5) for error in the jury's fixing of the amount of recovery, and (6) for insufficiency of the evidence. But their arguments really only boil down to a singular claim that a new trial is warranted because the

jury did not adopt Steger's estimate for repairing all three waterways as the measure of damages.

"The determination of damages is traditionally a jury function" and "should be disturbed 'only for the most compelling reasons.'" *Est. of Pearson ex rel. Latta v. Interstate Power & Light Co.*, 700 N.W.2d 333, 345 (Iowa 2005) (quoting *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990)). In determining whether a jury's verdict is inadequate, we view the evidence in the light most favorable to the verdict. *See id.* We will not interfere with a jury's determination on damages "when it is within a reasonable range of the evidence." *Stender v. Blessum*, 897 N.W.2d 491, 517 (Iowa 2017) (citation omitted).

Steger submitted an estimate in the amount of $94,636.00. Roughly $20,000.00 of this estimate was attributable to the east and west waterways, leaving the estimate at roughly $75,000.00 for repair of the main waterway. But Steger's estimate was certainly a very high outlier when considering the other evidence presented. The plaintiffs had already received one estimate in 2019 that ranged from $6850.00 to $18,631.58, but they did not pursue that bid any further. Doc Bradley, on the other hand, said he would estimate the project at $2000.00, while other bidders in the area might come in as high as $3500.00. Bradley submitted this would be a one-day job encompassing a total of ten hours.

While the jury adopted a measure of damages on the low end of the range of evidence, it was still within the range of evidence. *See MidAm. Energy Co. v. McAninch Corp.*, No. 06-0328, 2007 WL 257899, at *3 (Iowa Ct. App. Jan. 31, 2007). We are also mindful of and "give weight to the fact the trial court, with benefit of seeing and hearing witnesses, observing the jury and having before it all

incidents of the trial, did not see fit to interfere." *Olsen v. Drahos*, 229 N.W.2d 741, 743 (Iowa 1975). With these considerations in mind and viewing the evidence in the light most favorable to the verdict, we are unable to conclude the district court abused its discretion in denying the motion for a new trial on this point.

## IV. Conclusion

Finding no error or abuse of discretion in the district court's denial of the plaintiffs' motion for a new trial, we affirm.

**AFFIRMED.**