# IN THE SUPREME COURT OF IOWA

No. 116 / 04-1986

Filed April 20, 2007

**ALLIANT ENERGY-INTERSTATE POWER
AND LIGHT COMPANY, INTERSTATE
POWER AND LIGHT COMPANY, INTERSTATE
POWER AND LIGHT COMPANY, f/k/a
IES UTILITIES, INC., and/or ALLIANT ENERGY
CORPORATION,**

Appellees,

vs.

**BO DUCKETT, a/k/a MARY DUCKETT,
f/k/a MARY E. JEAMBEY**,

Appellant.

_____

Appeal from the Iowa District Court for Story County, Dale E. Ruigh, Judge.

Appeal from summary judgment on a claim for indemnification. **REVERSED AND REMANDED**.

Merrill C. Swartz and John B. Grier of Cartwright, Druker & Ryden, Marshalltown, for appellant.

David R. Schlee and Truman K. Eldridge, Jr., of Schlee, Huber, McMullen & Krause, P.C., Kansas City, Missouri, and Stephen J. Powell and Jim D. DeKoster of Swisher & Cohrt, P.L.C., Waterloo, for appellees.

**CADY, Justice.**

In this appeal, we must construe a natural gas utility's tariff that provides for indemnity. The district court granted summary judgment for the utility, and awarded it indemnity from the customer. We reverse and remand.

### I.     Background Facts and Proceedings.

Alex Saunders died from a natural gas explosion that occurred in his apartment on April 9, 2001. The apartment was located in Ames, and was part of a three-plex unit created from an old two-story single-family dwelling. Bo Duckett (Duckett) purchased the apartment building in 1984, and maintained it until the time of the explosion. Duckett generally performed the light-duty maintenance on the building, but contracted out most of the electrical, plumbing and furnace work. One contractor was Ames Heating and Cooling, which inspected and maintained the wall furnace in Alex Saunders's living room. The furnace received natural gas through a connector pipe, which served as the connection between the furnace and the home's natural gas distribution pipe. The explosion was the result of a natural gas leak from the connector pipe, but the specific reason for its failure remains unknown. The connector pipe was manufactured and installed some thirty-six years earlier. Alliant Energy Corporation (Alliant)[1] supplied natural gas to the multi-family residence, but did not design, manufacture, sell, supply or otherwise handle the connector responsible for the leak.

---

[1]Alliant is the parent company of another named defendant, Interstate Power & Light Company. As the trial court and parties have done throughout these proceedings, we will refer to both companies as Alliant. Alliant, of course, was also formerly known as IES Utilities.

In July of 2002, the Estate of Saunders (Saunders) sued Alliant for Alex Saunders's death. The theories of liability included negligence (relying on the doctrine of res ipsa loquitor), and breach of express and implied warranty. Alliant denied the claims in its answer. Alliant also filed a cross-claim against Duckett, alleging it was entitled to indemnification or contribution from Duckett if it paid a claim to Saunders for any amount. Saunders then amended the petition to assert claims against Alliant, Duckett, and Ames Heating and Cooling for wrongful death under theories of negligence, breach of contract, breaches of express and implied warranties, and loss of spousal consortium. Alliant answered the amended petition and expressly denied any liability, but sought indemnity from Duckett if it was in fact deemed liable to Saunders for any amount. Duckett also filed answers to Saunders' petition and Alliant's cross-claim, and denied liability, claiming the decedent and other defendants were at fault.

The case never went to trial. Saunders settled the claims against Alliant, Duckett, and Ames Heating and Cooling for $325,000.[2] Alliant's cross-claim against Duckett, however, survived.[3] Thereafter, Duckett and Alliant filed motions for summary judgment regarding the cross-claim. Alliant ultimately relied on section 5.12 of a tariff filed with the Iowa Utilities Board (IUB) to support its claim for indemnity from Duckett. In her first motion for summary judgment, Duckett claimed Alliant's settlement was based solely on its own fault, and the tariff did not specifically allow Alliant to be indemnified for its own fault. Alliant's

---

[2]Duckett settled for $25,000 and Alliant and Ames Heating and Cooling settled for $150,000 each.

[3]The Settlement Agreement with Alliant specifically reserved the claim of indemnification against Duckett.

motion for summary judgment alleged there was no genuine issue of material fact and that it was entitled to judgment as a matter of law. Duckett filed a second motion for summary judgment and argued Alliant had no right to indemnity because Alliant must prove it was liable to Saunders and it had failed to do so.

Based on the record, the district court denied Duckett's motions for summary judgment, and granted judgment for Alliant. The district court interpreted the tariff to entitle Alliant to indemnification regardless of who was at fault. The district court noted there was no genuine claim that Alliant was at fault for the explosion because "the existing record contains no evidence of Alliant's negligence or fault in causing the April 9, 2001, explosion and resulting damages." The district court also held the settlement was reasonable.

Duckett then filed an Iowa Rule of Civil Procedure 1.904(2) motion and a motion to dismiss. She argued the district court lacked the authority to hear the case, and reiterated that Alliant had to prove it was liable because it could not be indemnified if it was not at fault. The district court denied the motions.

On appeal, Duckett claims the district court erroneously granted Alliant's motion for summary judgment because Iowa law and public policy considerations forbid indemnification in this case, and even if indemnification is allowed under the terms of the tariff, Alliant cannot be indemnified because Alliant did not prove it was liable to Saunders. Duckett additionally argues that if Alliant did not have to prove it was liable, then we should remand the case to the district court to allow her to prove that Alliant was liable to Saunders. Finally, Duckett claims the district court should have granted her motion to dismiss because the

IUB, not the district court, had jurisdiction and authority over the indemnity claim.

## II.    Standard of Review.

A district court's entry of summary judgment is reviewed for the correction of errors at law.  *Kistler v. City of Perry*, 719 N.W.2d 804, 805 (Iowa 2006) (citing *Campbell v. Delbridge*, 670 N.W.2d 108, 110 (Iowa 2003)).  "Summary judgment is appropriate only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law."  *Id.*  Our review of a district court's ruling on a motion to dismiss is also for errors at law.  *Ritz v. Wapello County Bd. of Supervisors*, 595 N.W.2d 786, 789 (Iowa 1999) (citing Iowa R. App. P. 4; *McCormick v. Meyer*, 582 N.W.2d 141, 144 (Iowa 1998)).  "Ultimately, 'our decision to overrule or sustain a motion to dismiss must rest on legal grounds.' "  *Trobaugh v. Sondag*, 668 N.W.2d 577, 580 (Iowa 2003) (quoting *Haupt v. Miller,* 514 N.W.2d 905, 907 (Iowa 1994)).

## III.   Duckett's Jurisdictional Challenge.

Alliant claims we need not address Duckett's challenge to the jurisdiction of the court to hear the cross-claim because Duckett waived the challenge.  We have stated previously:

> When a party claims a jurisdictional challenge has been waived, it is often necessary to determine whether the specific challenge to jurisdiction targets subject matter jurisdiction or jurisdiction of a particular case.  Subject matter jurisdiction refers to the authority of the court to hear and determine the general class of cases to which the proceeding belongs.  It cannot be conferred by consent, waiver, or estoppel.  This is because parties to a lawsuit cannot establish jurisdiction where it has not been first conferred by the constitution or legislation.  On the other hand, the failure to properly invoke the authority of the court in a particular case can be obviated by consent, waiver, or estoppel.

*Keokuk County v. H.B.,* 593 N.W.2d 118, 122 (Iowa 1999). Based on Duckett's arguments, it is difficult to determine whether her objection "targets subject matter jurisdiction or jurisdiction of a particular case."[4] In her motion to dismiss,[5] Duckett argued the IUB had "exclusive jurisdiction" of Alliant's cross-claim and a party could raise "subject matter jurisdiction" at any time. She also argued the IUB retained "primary enforcement authority" of the matter. Accordingly, Duckett argued the summary judgment against her should be void.[6] The district court properly noted Duckett's motion to dismiss referred to separate jurisdictional concepts that are not identical. In her appellate brief, Duckett still refers to her argument as one based on "jurisdiction/authority."

Thus, we find it once again "helpful at this juncture to point out the difference between a court's subject matter jurisdiction and its authority." *State v. Emery,* 636 N.W.2d 116, 119 (Iowa 2001). "Subject matter jurisdiction refers to 'the authority of a court to hear and determine cases of the *general class* to which the proceedings in question belong, not merely the particular case then occupying the court's

_____

[4]As the sentence implies, "jurisdiction of a particular case" does not mean subject matter jurisdiction. *See Christie v. Rolscreen,* 448 N.W.2d 447, 450 (Iowa 1989) ("Sometimes we have referred to 'lack of authority to hear the particular case' as lack of jurisdiction of the case." (Citation omitted.)). Instead, jurisdiction of the case refers to the court's authority to hear the *specific* or *particular* case. *See State v. Wiederien,* 709 N.W.2d 538, 540 (Iowa 2006) (noting " 'lack of jurisdiction of the case[]' occurs when the court has subject matter jurisdiction but may not be able to act in a particular case for some reason" (citing *Christie,* 448 N.W.2d at 450)).

[5]Duckett also filed a rule 1.904(2) motion that argued the district court lacked jurisdiction/authority.

[6]An argument that a judgment is void is an argument based on lack of subject matter jurisdiction, not authority. *See In re Estate of Falck,* 672 N.W.2d 785, 791 (Iowa 2003) (noting the lack of subject matter jurisdiction renders a judgment void and subject to collateral attack, whereas lack of authority simply makes the judgment voidable).

attention.' " *Christie*, 448 N.W.2d at 450 (emphasis added) (quoting *Wederath v. Brant*, 287 N.W.2d 591, 594 (Iowa 1980)). "A court may have subject matter jurisdiction but for one reason or another may not be able to entertain a particular case. In such a situation we say the court lacks authority to hear that particular case." *Emery*, 636 N.W.2d at 119.

Importantly, "[a] court may lack authority to hear a particular case 'where a party fails to follow the statutory procedures for invoking the court's authority.' " *Id.* (quoting *Shrier v. State*, 573 N.W.2d 242, 244–45 (Iowa 1997)). Although Duckett argues in terms of jurisdiction and authority, she ultimately argues Alliant failed to follow statutory procedure because it was required to exhaust its administrative remedies through the IUB.

Regarding this specific issue we have said:

> It is well-established that a party must exhaust any available administrative remedies before seeking relief in the courts. The district court is deprived of jurisdiction of the case[7] if administrative remedies are not exhausted.
>
> . . . .
>
> Generally, the exhaustion-of-remedies requirement does not implicate subject matter jurisdiction. This is because the exhaustion-of-remedy doctrine does not preclude judicial review, but merely defers it until the administrative agency has made a final decision. Our legislature has given the district court subject matter jurisdiction to act in response to challenges to decisions made by administrative agencies, but requires this authority to be withheld until any available administrative remedies have been exhausted. Thus when a litigant requests judicial review before exhausting administrative remedies, the

---

[7]This reference to "jurisdiction of the case" is synonymous with a court's particular, as opposed to general, "authority." "Jurisdiction of the case" does not mean subject matter jurisdiction. *See Christie*, 448 N.W.2d at 450 ("Sometimes we have referred to 'lack of authority to hear the particular case' as lack of jurisdiction of the case." (Citation omitted.)).

district court merely lacks authority to entertain a particular case. This is the type of challenge that can be waived.

*Keokuk County,* 593 N.W.2d at 122. Thus, even if we interpreted Duckett's argument to encompass an objection to subject matter jurisdiction, such jurisdiction is not at issue here. Instead, the issue before us is whether the court lacked the authority to hear the case. As a result, the defect can be waived if not timely raised by an objection. *See Emery,* 636 N.W.2d at 120 ("[A] defect in the court's authority to hear a particular case may be waived, whereas any defect in its subject matter jurisdiction is not subject to waiver." (citing *State v. Mandicino,* 509 N.W.2d 481, 482 (Iowa 1993))).

Alliant argues Duckett failed to timely challenge the court's authority and therefore waived this defense. *See* 21 C.J.S. *Courts* § 85, at 114 (2006) ("An objection that the court lacks jurisdiction of the subject matter may be made at any time; generally, an objection to jurisdiction on any other ground is waived if not made at the first opportunity or seasonably. . . . An objection to jurisdiction based on any ground other than lack of jurisdiction of the subject matter . . . is usually waived by failure to raise the objection at the first opportunity, or in due or seasonable time, or within the time prescribed by rule or statute."); *In re Marriage of Ivins,* 308 N.W.2d 75, 77 (Iowa 1981) ("It is true that subject-matter jurisdiction cannot be waived or conferred by consent. However, this is not true in the case of objections to personal jurisdiction, such as involved here, which will be deemed waived unless raised 'at the first opportunity, or in due or reasonable time . . . .' " (Citations omitted.)). Duckett admits she did not raise her objection when Alliant first filed its cross-claim with the district court. She insists, however, the objection was raised as soon as practicable. She contends

she did not know Alliant was relying on the indemnification provision in the tariff for its cross-claim, and was not in a position to argue the cross-claim should be heard by the IUB until she learned the tariff provision was at issue.[8]

Duckett is correct Alliant's cross-claim for contribution and indemnity did not mention the tariff provision. Thus, when Duckett filed her answer to Alliant's cross-claim she may not have been responsible for raising the issue of the court's authority to hear the claim. However,

---

[8]Importantly, the "filed tariff doctrine" applied once the claim became one involving a utility's tariff provision. *See Teleconnect v. U.S. W. Commc'ns, Inc.*, 508 N.W.2d 644, 647–48 (Iowa 1993). "Under th[is] doctrine, the relevant regulatory agency retains primary enforcement authority over utility disputes in which, absent the tariff scheme, contract or tort law would ordinarily govern." *Id.* (citations omitted). In addition, we have recognized:

> Virtually all authorities hold when authority is delegated to an administrative officer or body, such delegation within its terms and limitations is primary and exclusive unless a contrary intent is clearly manifested by the legislature. . . . [T]he provisions for appeal, first to the district court and then to this court, make it apparent the legislature intended the administrative remedy before the Commerce Commission should be first exhausted before resort could be had to the courts. Until the Commission has made its finding and has entered its order so that an appeal may be taken to the district court as provided in section 490A.13, Code, the jurisdiction of the Commission is exclusive. In the case now before us this administrative remedy had not been exhausted and the district court was without jurisdiction to consider the controversy.

*Elk Run Tel. Co. v. Gen. Tel. Co. of Iowa*, 160 N.W.2d 311, 315 (Iowa 1968). The Commerce Commission was the predecessor to the IUB. *See Teleconnect*, 508 N.W.2d at 646. Thus, our case law and statutory law require the IUB to hear the dispute first, and then allows the district court to review the decisions of the IUB. *See* Iowa Code §§ 17A.19(1), 476.13; *Teleconnect*, 508 N.W.2d at 647; *Elk Run*, 160 N.W.2d at 315. As we have already determined, the failure to follow this procedure divests the court of its particular authority to hear the case. It does not create a situation where the district court lacks subject matter jurisdiction.

We additionally note the district court in this case, in ruling on Duckett's motion to dismiss, held the IUB did not have primary enforcement authority. It recognized the filed tariff doctrine applied, but that in this case it did not provide the IUB with primary enforcement authority because any remedy the IUB could provide would be inadequate. We need not determine the propriety of this decision because we ultimately find Duckett waived any jurisdictional argument.

Duckett subsequently learned the tariff was at the heart of the cross-claim, and failed to raise the issue until January 2004, more than a year later. Duckett even invoked the court's authority to grant summary judgment based on her claim the tariff did not permit Alliant to be indemnified before she finally decided to challenge the court's authority to hear the cross-claim. In fact, Duckett did not raise the issue until after the district court ruled on the summary judgment motions filed by the parties. Based on these facts, it becomes clear that Duckett did not timely raise her objection to the court's authority.[9] Her failure to do so results in waiver.

**IV. Indemnification.**

Indemnification is a difficult subject, and the legal principles we have developed in indemnification cases are not always easy to apply. We have previously

> acknowledge[d] the complexity of the law of indemnification and the challenges that can confront judges and lawyers in its application to particular factual circumstances. Essentially, the historical complexity in this area of the law can be traced to the competing legal and equitable interests that give rise to the doctrine, as well as an array of public policy considerations.

*McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564, 574 (Iowa 2002) (citations omitted). Nevertheless, the difficulties in this area are often allayed by first determining the terms of the indemnification agreement. The agreement in each case ultimately

---

[9]It does not matter that Duckett made a rule 1.904(2) motion to enlarge or amend the findings of the district court after its rulings on the motions for summary judgment. This motion, which also asserted the court lacked jurisdiction/authority, may have helped preserve the issue for appeal, but it does not mean Duckett made the jurisdictional/authority argument during the summary judgment proceedings (and thus "timely"). While a rule 1.904(2) motion presents a claim that a district court overlooked an issue it now needs to rule on, that is not the case here where the district court could not have overlooked this issue because the parties never brought it up until after the summary judgment rulings.

determines the rights of the parties because our legal principles concerning indemnification are often qualified by the particular terms of the agreement, or the tariff in this case.

Therefore, we begin by considering the language of the utility tariff. Section 5.12 of the tariff states:

> Customer shall indemnify, hold harmless and defend Company against all claims, demands, costs or expenses for injury to persons or loss or damage to property, in any manner directly or indirectly connected with, or growing out of the distribution or use of gas service by Customer at or on Customer's side of the point of delivery.

We must interpret section 5.12 the same as any other contract for indemnification. Although Alliant is correct that a tariff "has the force and effect of law," this does not mean it should be interpreted differently than other contracts. *Estate of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 342 (Iowa 2005). The terms of a tariff essentially replace private contracts, and "[w]e construe a tariff according to the same rules as contracts." *Id.* at 342–43. Therefore, the general rule that indemnification provisions are subject to the same formation, validation, and interpretation rules as other contracts is not altered because the indemnity provision is part of a tariff. *See McNally*, 648 N.W.2d at 571 ("A contract for indemnification is generally subject to the same rules of formation, validity and construction as other contracts." (citing *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 916 (Iowa 1975))); *Cochran v. Gehrke, Inc.*, 293 F. Supp. 2d 986, 994 (N.D. Iowa 2003) (same).

We have previously stated these rules in the context of a tariff as follows:

> In construing a written contract, "the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." We construe a contract in its entirety by considering all of its pertinent

provisions. We assume no part of the contract is superfluous or of no effect and a construction giving meaning to all its clauses is preferred. If a tariff is ambiguous, we strictly construe the language of a tariff against the drafter, the utility. A strict construction against a tariff's drafter is not justified when the construction would ignore a permissible and reasonable construction that conforms to the intentions of the framers of the tariff. Any ambiguity created by the incorporation of seemingly contradictory clauses must be resolved against the drafter of the contract.

This rule of strict construction, however, does not apply if a strict construction of the tariff has the effect of discriminating based on price or service.

*Estate of Pearson,* 700 N.W.2d at 343–44 (citations omitted). In addition, we have noted two questions must be answered when determining a party's right to indemnification: " '(1) for whose negligent acts causing damage is indemnity promised? and (2) what is the scope of the area in which indemnity is available?' " *Modern Piping, Inc. v. Blackhawk Automatic Sprinklers, Inc.,* 581 N.W.2d 616, 624 (Iowa 1998) (quoting *R.E.M. IV, Inc. v. Robert Fl. Ackermann & Assocs., Inc.,* 313 N.W.2d 431, 433 (Minn. 1981)); *see Cochran,* 293 F. Supp. 2d at 994 (asking these questions). Thus, we now apply our rules of construction to answer these questions.

Section 5.12 fails to specifically reference for whose negligent acts indemnity is promised. In this regard, it is ambiguous and warrants a strict construction against the utility. *Estate of Pearson,* 700 N.W.2d at 343. It simply provides that the customer must indemnify the gas company against claims for loss or damage connected with the use of the gas service by the customer "at or on the customer's side of the point of delivery." We refuse to find, as the district court did, that this language permits indemnity regardless of who was negligent. Moreover, we find section 5.12 only permits indemnity when the customer is at fault.

First, section 5.12 does not say, with any unambiguous terms or any reasonable construction, that Alliant can be indemnified for its own fault or when Duckett is not at fault. Alliant, in fact, conceded at oral argument that section 5.12 did not permit indemnity for Alliant's own fault. This construction is consistent with our requirement that an indemnity agreement must clearly express an intention to indemnify the indemnitee for its own negligence in order to give it that effect. *See McNally*, 648 N.W.2d at 571 ("[I]ndemnification contracts will not be construed to permit an indemnitee to recover for its own negligence unless the intention of the parties is clearly and unambiguously expressed.").

Second, it could not have been the intention of the tariff for Alliant to be indemnified by the customer when the customer was not at fault. The tariff is an agreement between Alliant and the customer, and while it protects Alliant from claims brought by third persons, *see Estate of Pearson*, 700 N.W.2d at 344–45 ("[T]he intent of section 5.12 was to protect [the indemnitee] from claims brought by third parties, not those of the customer."), we refuse to read it in such a way that could force a faultless customer to indemnify a faultless indemnitee, *see McNally*, 648 N.W.2d at 571 ("The traditional reluctance of courts to allow the burden of one who is negligent to be transferred to another who is not at fault, especially where there is a disparity in bargaining power and economic resources of the parties, can be traced to public policy considerations. Thus, indemnification contracts claimed to contain these provisions are construed more strictly than other contracts." (Citation omitted.)). Instead, the language of the tariff limits indemnity to when the underlying claim is for damage connected with or growing out of the use

of gas service by the customer. This language supports the approach that the actions of the customer must be a cause of the damage. Moreover, sections 2.12, 2.24, and 4.06 of the tariff reveal that the customer is made responsible to install and maintain the proper equipment and apparatus to use the gas service on the customer's side of the point of delivery. These sections impose a duty on the customer to properly maintain the pipes and apparatus in using the gas service on the customer's side of delivery, and the tariff then imposes indemnification involving damage claims connected with the failure of the customer to properly perform its obligations under the tariff in using the gas service. *See Estate of Pearson*, 700 N.W.2d at 343 (recognizing a contract is construed in its entirety). Thus, we conclude section 5.12 of the tariff only provides indemnity when the customer is negligent.

We now consider the scope of indemnity in this case. Section 5.12 makes indemnity available when the loss or damage is at least indirectly connected with the use or distribution of gas, and occurs at or on the customer's side of the point of delivery. The point of delivery is the outlet of the company gas meter where the company delivers the natural gas. There is nothing ambiguous about this language, nor about the circumstances of this case. The claims all stem from the natural gas explosion that occurred on Duckett's side of the point of delivery, which no party disputes, and which are clearly encompassed by the scope of the area in which indemnity is provided in section 5.12.

Applying our rules of construction to section 5.12, we find it only permits indemnification when the customer is negligent and when the loss or damage occurs at or on the customer's side of the point of

delivery. Otherwise, Alliant has no claim for indemnity. We now address the arguments of the parties as they relate to our construction of section 5.12.

Duckett first argues Alliant's indemnification claim must fail because section 5.12 does not permit Alliant to be indemnified for its own negligence. *See McNally,* 648 N.W.2d at 571. It maintains Alliant has sought indemnification for its own negligence in this case because it settled the underlying claim with Saunders based on claims of its own negligence.

We have adopted the general rule that an indemnification agreement will not be construed to permit an indemnitee to recover for its own negligence unless the indemnification agreement clearly provides otherwise. *Id.* at 572. However, the application of this rule of construction to this case is not in dispute. Both Duckett and Alliant, as do we, agree the tariff does not permit the gas company to recover indemnification for its own negligence. Thus, the question is whether Alliant is seeking indemnification from Duckett for its own negligence, contrary to the terms of the tariff, because the claim by Saunders that resulted in the loss to Alliant was based on allegations of Alliant's own negligence.

Duckett argues the grounds for a claim for indemnification are confined to the grounds or allegations asserted against the indemnitee in the underlying action. Thus, Duckett argues that if the underlying claim brought against an indemnitee is based on allegations of its own negligence, as in this case, any subsequent claim for indemnification by the indemnitee must necessarily be based on its own negligence. Duckett primarily relies on our prior pronouncement in *McNally*:

> When the underlying litigation settled by a potential indemnitee was limited to allegations of the indemnitee's own negligence not covered under the indemnification agreement, there can be no claim for indemnity because the amount paid in the settlement could only have been the result of the indemnitee's own noncovered negligence.

648 N.W.2d at 578.

We recognize that allegations of liability against an indemnitee in a claim brought by the injured party normally frame the grounds upon which liability could be imposed against the indemnitee in the underlying action. Thus, we agree with Duckett that a settling indemnitee can normally only establish its own liability to the injured party so as to support a claim for indemnification within the context of the grounds for liability alleged by the injured party in the underlying claim. However, this limitation is only important in an indemnification claim when the indemnification agreement limits indemnification to those circumstances where the indemnitee must establish its own liability to the injured party as an element of recovery.

Generally, an indemnitee who has settled the underlying claim must first establish it was liable to the injured party as an element of recovering indemnification. *Ke-Wash Co. v. Stauffer Chem. Co.*, 177 N.W.2d 5, 11 (Iowa 1970). This rule, however, does not apply if the indemnification agreement does not require it. *McNally*, 648 N.W.2d at 575. In *McNally*, we referred to indemnification under these circumstances as based on a "purely voluntary" loss. *Id.* When an indemnification agreement permits the indemnitee to recover indemnification independent of any underlying liability to the injured party, then the allegations of liability by the injured party do not limit the indemnitee's claim for indemnification. Instead, when the indemnification agreement permits indemnification for a loss incurred for

reasons other than legal liability, or a "purely voluntary" loss, the indemnitee is entitled to show as a part of the indemnification claim that the loss incurred by settling the underlying claim brought by the injured party was based on non-legal reasons, such as a business decision, despite the allegations of its own legal liability.

The indemnification claim brought in *McNally* failed not only because the underlying claim by the injured party was limited to grounds of negligence that did not permit indemnification under the indemnification agreement, but also because the indemnification agreement did not permit the indemnitee to obtain indemnification without first establishing it was liable to the injured party. *Id.* at 576–78. In other words, the indemnitee could not recover indemnification under the agreement if the settlement was "purely voluntary," or based on non-legal reasons. In that dual context, the settlement by the indemnitee precluded indemnification.

In this case, as in *McNally*, the indemnitee cannot recover indemnification under the tariff if the settlement was based on the negligence of the indemnitee. However, unlike the indemnification agreement in *McNally*, the indemnification tariff in this case does permit indemnification based on a "purely voluntary" loss, or otherwise a settlement based on reasons independent of the indemnitee's liability.

This approach is evident from the specific language of the tariff that limits indemnification only when the injury or damage resulted from the customer's use of the gas service, together with the undisputed proposition that the tariff does not permit the gas company to obtain indemnification when its own negligence was a cause of the injury or damage. As a result of these two standards, the tariff necessarily

contemplates that a "purely voluntary" payment will serve as the basis for the loss that gives rise to a claim for indemnification, not a payment based on the liability or negligence of the gas company. This approach reveals an "intent to alter the rule against voluntary payments." *See id.* at 575. An indemnification tariff that never permits indemnification if the gas company is at fault, conversely can only mean indemnification is available when the gas company is not at fault. Consequently, this interpretation allows the gas company to settle a claim brought by the injured party based on claims of its own negligence, then show in an indemnification action that the loss or settlement by the gas company was actually a "purely voluntary" loss based on the liability of the customer, not its own negligence.[10]

Duckett has also argued that Alliant cannot be indemnified in this case because Iowa law requires an indemnitee who has settled the underlying claim to prove it was liable to the claimant prior to recovery, and that Alliant has failed to do so. Her argument is based on the following principle we announced years ago:

> We hold except where there is an expressed agreement for indemnification providing otherwise as in *Robert & Company Associates v. Pinkerton & Laws Co.*, 169 S.E.2d 360, 362–63, a party seeking to establish in an independent action a right of indemnity as a theory of recovery must plead and prove three basic elements: (1) it was liable to the injured party, (2) the settlement was reasonable and (3) the facts are such as to give rise to a duty on the part of the indemnitor to indemnify the indemnitee.

*Ke-Wash*, 177 N.W.2d at 11. Yet, as we noted in *Ke-Wash*, the requirement to prove liability is unnecessary when the terms of the

---

[10]We need not address Duckett's argument that public policy considerations forbid Alliant from recovering indemnity for its own negligence. The tariff does not permit Alliant to do so, and Alliant was not seeking indemnity under such circumstances.

agreement provide otherwise. *Id.*; *see also McNally*, 648 N.W.2d at 574–75 (recognizing the *Ke-Wash* requirements and the exception); *Kaydon Acquisition Corp. v. Custom Mfg., Inc.*, 317 F. Supp. 2d 896, 908–10 (N.D. Iowa 2004) (discussing the "*McNally & Nimergood* exception"). This is exactly the case here. As we have determined, the tariff eliminates the first *Ke-Wash* element. Any other interpretation would render the tariff useless. A settling indemnitee could never recover if it had to prove its liability to meet the requirements of our law, and yet also prove it was not at fault to meet the requirements of the tariff. We will not construe the tariff in such a manner as to nullify its provisions and impose an impossible burden on the indemnitee. *See Estate of Pearson*, 700 N.W.2d at 343–44 (recognizing that we will construe a contract to give it meaning).

This analysis and construction of the tariff disposes of both arguments raised by Duckett in support of her claim that Alliant was not entitled to summary judgment. As to the first argument, although the tariff does not entitle the gas company to indemnification for its own negligence, a gas company can under the tariff settle the underlying lawsuit based on claims of its own negligence and then establish in the indemnification action that the customer was in fact the negligent party. As to the second argument by Duckett, the tariff reveals it does not follow the traditional notion of treating indemnification as an obligation to indemnify the indemnitee against liability of the indemnitee to another or against a loss resulting from liability. *See McNally*, 648 N.W.2d at 570, 577. Consequently, the requirement to plead and prove its own liability when the underlying claim for damages was settled without an

adjudication of liability does not apply. *See id.* at 574–75; *Ke-Wash*, 177 N.W.2d at 11–12.

Nevertheless, the district court erroneously held the tariff allowed indemnity regardless of who was at fault. The tariff only allows indemnity when Alliant is not at fault and the customer is at fault. It was error for the district court to hold otherwise. Moreover, this error was visited upon the summary judgment entered by the district court because the court made no additional finding that the customer failed to properly install or maintain the equipment, or was otherwise at fault, in the use of the gas service. The district court only determined there was no evidence Alliant was at fault, and it was undisputed the cause of the damages occurred at a connector pipe on the customer's side of the point of delivery.[11] Without an additional determination that there is no factual issue with respect to the customer's fault in the installation, maintenance, or care of the connector pipe, summary judgment was improper. Thus, we remand the case in order for the court to make this additional determination, and in light of its conclusion, reconsider the propriety of summary judgment.[12]

In the end, the tariff does not disadvantage the customer but merely gives the gas company greater power to settle a claim brought by a person who has been injured from a natural gas explosion or some

---

[11]Our law additionally requires that Alliant, as a settling party seeking indemnification, prove the settlement was reasonable. *See Ke-Wash*, 177 N.W.2d at 11. The district court concluded the reasonableness of Alliant's settlement was undisputed. Duckett makes no argument on appeal that the settlement was unreasonable.

[12]The district court permitted Alliant to seek further indemnification for expenses or costs related to the litigation as a result of its ruling. The record is unclear whether Alliant has done so. While we recognize such expenses or costs are included in section 5.12, the recovery of them requires the same showing Alliant must make to recover its actual settlement.

other catastrophe due to the distribution and use of metered gas. The tariff enables the gas company to pay a settlement to the injured person even when its evidence shows the customer was at fault, and to then sue the customer for indemnification by establishing that the customer was the party at fault. The other elements of recovery under *Ke-Wash* are applicable to protect the customer, and the customer will never be responsible for indemnification without proof of its own fault. The tariff ultimately permits the injured person to be removed from the litigation and to allow the defendants to litigate the issue of liability between them.

**REVERSED AND REMANDED.**

All justices concur except Appel, J., who takes no part.