UNION INSURANCE COMPANY,
Plaintiff,

v.

HULL & COMPANY, INC., Defendant.

No. 4:10–cv–00337–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 4, 2012.

Jeffrey W. Lanz, Huber Book Cortese Happe & Lanz PLC, West Des Moines, IA, Daniel G. Litchfield, Stephanie W. Tipton, Litchfield Cavo LLP, Chicago, IL, for Plaintiff.

John T. Clendenin, John F. Lorentzen, Nyemaster Goode West Hansell & O'Brien PC, Des Moines, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, Chief Judge.

This matter is before the Court on Cross–Motions for Summary Judgment brought by Plaintiff Union Insurance Company (Union) and Defendant Hull & Company, Inc. (Hull). On August 1, 2012, the Court held a hearing on the motions. Attorneys Jeffrey Lanz and Stephanie Tipton represented Union, and attorneys John Clendenin and Christian Walk represented Hull. The motions are fully submitted and ready for disposition. On the following analysis, the Court finds Plaintiff's motion must be denied and Defendant's motion must be granted.

## I. BACKGROUND

### A. The Hull–Union Agreement and Underwriting Guidelines

Union is an Iowa insurance company, and Hull is Florida corporation. On April 1, 2000, Hull entered into an Agency–Company Agreement (the Agreement) with five related insurance companies, including Union. The Agreement, which identifies the insurance companies, including Union, as "Company" and Hull as "Agent or Agency," provides, in part,

> Subject to requirements imposed by law, the terms of this Agreement, the underwriting rules and regulations as contained within the Agent's Manual, and where applicable Addendum I, Agency is authorized to receive, accept and strictly in accordance with Company binding guidelines, bind proposals for contracts of insurance for risks located in the Agency state of domicile and any other states where Agency holds a proper

nonresident license and for which a commission is specified in the current Commission Schedule. . . . It is further understood and agreed that Agency shall under no circumstances have authority to bind any risk for:

(1) Any coverage when such authority has been restricted by submission or prohibited list published in the Agents Manual or any other written notice given to Agency.

(2) Coverage limits in excess of those published in the rate section of the Agent's Manual.

Agreement ¶ 1(A), Def.'s App. 3, ECF No. 61–3.

The Agreement also contains an indemnification provision, which provides, in part,

Agency agrees to indemnify, defend and hold Company harmless against any liability which Company may sustain or incur directly or indirectly due to or arising out of any obligation, act, failure to act, or transaction created or done by the negligence of Agency, Agency's employee, and/or Agency's sub-Agent in violation of, in excess of, or in contravention of the power and authority granted to Agency as set forth and described in this Agreement. Agency shall be liable for all damages, including but not limited to, fines and penalties incurred due to the action of Agency.

Id. ¶ 8(D), Def.'s App. 6.

The Agreement also has an integration clause providing that "[t]his Agreement and its attachments constitute the entire Agreement between the Agency and the Company" and that "[n]o waiver by either party of any provision of this Agreement will be effective unless made in writing and signed by an authorized officer of both parties." Id. ¶ 12, Def.'s App. 7. Paragraph 6, entitled "Amendment & Termination Procedures," provides that "[u]nless both Agency and Company agree in writing, any changes, modifications, revisions, deletion[s] or additions to this Agreement are prohibited." Id. ¶ 6(B), Def.'s App. 5. The Agreement further provides that it supersedes all previous agreements.

Union provided Hull with Revised Underwriting Guidelines (Underwriting Guidelines) in late 2004.[1] Although Hull received these Underwriting Guidelines, a representative from Hull did not sign an amendment or modification or any document accepting the Underwriting Guidelines, nor did Union provide Hull with additional compensation. The Underwriting Guidelines were "intended to provide a general framework" for commercial umbrella policies and were not intended to be "all encompassing with regard to class or limit restrictions." Underwriting Guidelines, Baker Decl. Ex. B, Pl.'s App. 262, ECF No. 60–6. Pursuant to the Underwriting Guidelines, Hull had complete underwriting authority for commercial umbrella and commercial excess liability policies with limits up to $5 million and thus did not need Union's approval to bind such policies. The Underwriting Guidelines provided that "[p]rimary policy (underlying) requirements" were $1 million per occurrence for general liability limits. Id. at 263.

## B. The Reinsurance Agreement Between Union and Westport

Union entered into a reinsurance agreement with Westport Insurance Company

---

1. There is a discrepancy as to the exact date Hull received the Revised Underwriting Guidelines. Robert Shepard's Declaration states that Union provided Hull with a copy of the Revised Underwriting Guidelines on September 17, 2004, Union's App. 215, ECF No. 60–6, while Ken Baker's Declaration states that Hull received the copy on December 10, 2004, id. at 251. This discrepancy is not material.

(Westport) on November 1, 1994 (reinsurance agreement), which applied to losses under Union's commercial and personal umbrella policies written through Hull. In the reinsurance agreement, in pertinent part, Union warrantied that the commercial umbrella policies subject to the reinsurance agreement would be placed above $1 million primary general liability coverage.

Hull negotiated contractual terms and conditions with Westport on Union's behalf; as part of this practice, Hull was aware of the reinsurance agreement between Union and Westport. If a special acceptance from a reinsurer was needed on any Union umbrella policy with respect to a reinsurance obligation, Hull would negotiate that special acceptance with the reinsurer on Union's behalf.

### C. The Mt. Hawley Policy

On July 11, 2005, Hull received a Commercial Insurance Application (the Application) submitted on behalf of the Thirsty Parrot, a tavern and restaurant in Colorado. The Application sought excess coverage over an underlying commercial insurance policy issued by Mt. Hawley Insurance Company (Mt. Hawley Policy). The Mt. Hawley Policy, issued on or about July 11, 2005, provided commercial general liability limits of $1 million per occurrence and $2 million in general aggregate limits. The Mt. Hawley Policy also contained an endorsement providing an assault or battery exclusion, which provided that "[t]his coverage does not apply to 'bodily injury' . . . arising out of an 'assault or battery' by any insured, whether provoked or unprovoked by any person, or out of any act or omission in connection with the . . . [n]egligent hiring, supervision or training of any 'employee' of the insured" or "[i]mplementation of adequate security meas-

ures, through security personnel, surveillance or other security devices." Mt. Hawley Policy Exclusion—Assault or Battery, Pl.'s App. 115, ECF No. 60–5. Form PGL 423 is an additional endorsement that modifies the commercial general liability coverage of the Mt. Hawley Policy by returning the coverage excluded by the prior endorsement but placing a sublimit of $500,000 per occurrence for bodily injury arising out of an assault or battery by any insured. This assault or battery endorsement with a $500,000 wasting sublimit, subject to reduction by defense costs.

After requesting, obtaining, and reviewing pricing information for the excess coverage applied for by the Thirsty Parrot, Hull placed the policy with Union.

### D. The Union–Thirsty Parrot Policy

On or about July 27, 2005, in fulfillment of the Application, Union issued a commercial umbrella insurance policy insuring the Thirsty Parrot, Policy No. DXS 2583839–20 (the Union Policy), which was underwritten by Hull. The Union Policy provided umbrella coverage of up to $1 million per occurrence and in the aggregate over the limits set forth in the Union Policy's section entitled "Schedule of Underlying Insurances." Union's Policy, Def.'s App. 164, ECF No. 61–3.

Condition K of the Union Policy provided that "[t]his insurance is excess over **underlying insurance** or any other valid and collectible insurance (except other insurance purchased specifically to apply in excess of this insurance) which is available to the **insured** covering a loss also covered by this policy." Union Policy § IV—Conditions: K, Def.'s App. 177, ECF No. 61–3.

Condition J of the Policy provided, in part,

MAINTENANCE OF UNDERLYING INSURANCE

1.  You will maintain the **underlying insurance** in full effect during the term of this policy without reduction of coverage or limits except for a reduction of limits solely by payment of damages because of **bodily injury, property damage, personal injury** or **advertising injury** . . . .`

2.  If you fail to maintain the **underlying insurance,** this insurance shall not replace the **underlying insurance** but shall apply as if the **underlying insurance** was valid and collectible.

*Id.* § IV—Conditions: J, Def.'s App. 176–77.

The Union Policy defines "underlying insurance" as "the insurance policies listed as Underlying Insurance, in the Declarations which provide the coverage and limits stated"; the Union Policy further provides that "[t]he coverage and limits stated in the Declarations for **Underlying Insurance,** and any renewals or replacements thereof, apply whether or not such is collectible." *Id.* § V—Definitions: T, Def.'s App. 181. The declarations page of the Union Policy disclosed that the underlying insurance was $1 million per occurrence.

In the Union Policy, Union agreed only to pay "the **ultimate net loss** the **insured** becomes legally obligated to pay as damages because of **bodily injury, property damage, personal injury** or **advertising injury** to which this insurance applies." *Id.* § I.A.1., Def.'s App. 168. The definition of net loss did not include defense costs.

The Union Policy further provided that Union had

the right and duty to defend any claim or **suit** seeking damages to which this insurance applies, but only with respect to damages:

a.  Not covered by **underlying insurance** or by any other valid and collectible insurance to the insured; or

b.  Covered by **underlying insurance** or any other valid and collectible insurance available to the insured except that such **underlying insurance** does not apply because the applicable limit of insurance has been used up solely by payment of damages because of **bodily injury, property damage, personal injury,** or **advertising injury** to which this insurance applies . . . .

*Id.* § I—Coverages: B.2, Def.'s App. 168–69.

At the time Hull underwrote the Union Policy, Hull had not reviewed the entire Mt. Hawley Policy but rather had only reviewed the Mt. Hawley Policy declarations page. In an email, Ken Baker, Vice President of Hull, stated that policies Hull underwrites for bars normally contain an "Assault and Battery exclusion." Baker Email, July 21, 2006, Pl.'s Suppl. App. 290, ECF No. 63.

**E.  The Underlying Claim and Settlement**

On December 15, 2005, a patron of the Thirsty Parrot was seriously injured by a Thirsty Parrot employee. The injured patron sued the employee and the Thirsty Parrot, asserting counts against both parties for assault, battery, and negligence, as well as a count against the Thirsty Parrot for negligent hiring and supervision.

On July 21, 2006, Union received a general liability notice of occurrence/claim from the Thirsty Parrot arising out of the injuries suffered by the patron (the underlying claim). Union's claim handler, Tom Estes, identified that there might be a gap in coverage between the $500,000 wasting

sublimit and the $1 million limit on the Union Policy. However, on November 17, 2006, Union's coverage counsel sent Estes a letter (November 17 letter) advising that there was no gap in coverage and that the Union Policy was excess over the $500,000 coverage provided by the Mt. Hawley Policy.[2]

On February 16, 2007, Union tendered a reservation of rights letter to the Thirsty Parrot; the reservation of rights letter did not address the potential gap in coverage, Condition J of the Union Policy, or the issue of defense costs.

On August 8, 2007, counsel for the Thirsty Parrot wrote to counsel for the injured patron stating that Union's position was "that its policy was *not* written with the intent to 'drop down' and cover the gap between $500,000.00 and $1,000,000.00," but Thirsty Parrot's counsel also indicated that Union might drop down but had not made a commitment to do so yet. Letter from Damian Stone & Judith Tartaglia, Def.'s App. 209, ECF No. 61–3.

On August 10, 2007, the injured patron made a settlement demand of $2 million, asserting that this demand was within the combined $1 million limit of the Mt. Hawley Policy and the $1 million limit of the Union Policy. On August 30, 2007, the underlying claim was mediated, but Union failed to contribute toward the settlement offer and the claim did not settle. On September 12, 2007, counsel for the

Thirsty Parrot sent a letter to Union suggesting that Union's failure to respond reasonably in negotiating settlement constituted bad faith under Colorado law. On October 29, 2007, after Union had independent counsel assess the potential exposure to be in excess of $1 million, the underlying claim settled for $1 million. Hull was not a party to this settlement.

The Mt. Hawley Policy tendered $200,000 toward the settlement, which constituted the remaining portion of the $500,000 sublimit after deductions for defense costs incurred by the Thirsty Parrot; Union's share of the settlement was therefore $800,000.

Union submitted a billing to its reinsurer, Westport, indicating that a settlement had been reached for $1 million. Westport responded and inquired whether there were any special acceptances, noting the fact that the reinsurance agreement contained a warranty stating that underlying limits would be at least $1 million but that there was a $500,000 wasting sublimit for the assault or battery endorsement. After Union inquired with Hull about whether there were any special acceptances, Union informed Westport that no special acceptances existed. A representative of Westport responded "that a legitimate argument can be made that a breach of the warranty to provide $1 million in underlying limits voids the entire cession," which "would result in no monies being owed

---

**2.** Hull objects to the inclusion of the November 17 letter asserting that it is incompetent expert opinion testimony that addresses a legal question—the interpretation of the Union Policy—which is specifically reserved to the Court and is thus inadmissible under Federal Rule of Civil Procedure 56(c)(2). *See* Fed. R.Civ.P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Union concedes that the Court may not use this letter in order

to assist in interpreting the contract, but asserts that the letter is only being offered to show what information Union was relying on when Union chose to settle the underlying claim. Therefore, the objection is overruled in that the Court will use the November 17 letter only for the limited purpose Union proposes and will not consider any coverage opinion letters dated after Union settled the underlying claim, as Union could not have relied upon those letters in deciding whether to settle.

under the reinsurance agreement." Brian Gray Email, Feb. 22, 2008, Pl.'s App. 71, ECF No. 60–4. As a compromise, the representative offered payment of $273,000, "the amount that would have been owed had the $1 million underlying limits been in place." *Id.* After arbitration, Union was reimbursed $273,978.78 by Westport.

Union filed this action against Hull on July 22, 2010.[3] Union's Second Amended Complaint alleges three counts: Count One seeks an order to compel arbitration; Count Two alleges breach of contract; and Count Three alleges that Hull has a duty to indemnify Union for the amount that Westport would have paid under the reinsurance agreement if Hull had placed the Union Policy over a policy with sufficient coverage. Union filed a motion to compel arbitration on May 17, 2011. On December 19, 2011, the Court denied the motion and dismissed Count One. On May 14, 2012, Union and Hull filed cross Motions for Summary Judgment on Counts Two and Three.

## II. DISCUSSION

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party must support its contention by pointing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to demonstrate

that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c)(1)(A). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.,* 674 F.3d 962, 972 (8th Cir.2012) (quoting *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011) (en banc)).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson,* 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). However, it is the nonmovant's burden to "produce sufficient evidence to support a verdict in his favor based on more than speculation, conjecture, or fantasy." *Doe v. Dep't of Veterans Affairs of the U.S.,* 519 F.3d 456, 460 (8th Cir.2008) (citation and internal quotation marks omitted). "A party cannot defeat a summary judgment motion by asserting 'the mere existence of *some* alleged factual dispute between the parties'; the party must assert that there is a *'genuine* issue of *material* fact.'" *Quinn v. St. Louis Cnty.,* 653 F.3d 745, 751 (8th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The grant of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

**3.** The Second Amended Complaint also listed Brown & Brown, Inc. (Brown), as a defendant, but the claims against Brown were dismissed by the Court's December 19, 2011, Order, 831 F.Supp.2d 1060 (S.D.Iowa 2011), pursuant to Federal Rule of Civil Procedure 12(b)(6).

which that party will bear the burden of proof at trial." *In re Baycol Prods. Litig.,* 596 F.3d 884, 888–89 (8th Cir.2010) (quoting *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548). "In sum, the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Reed v. City of St. Charles, Mo.,* 561 F.3d 788, 791 (8th Cir.2009) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

## B.  Breach of Contract

■  Union argues that it is entitled to summary judgment on its breach of contract claim based on the reinsurance agreement between Union and Westport and the Underwriting Guidelines, both of which Union asserts Hull was bound by pursuant to the Agreement, and both of which Union argues Hull breached. Union asserts that Hull violated the Underwriting Guidelines and reinsurance agreement because the Mt. Hawley Policy had an assault or battery endorsement with a $500,000 wasting sublimit, and thus Hull failed to comply with its obligations under the Underwriting Guidelines and the reinsurance agreement that underlying policies have $1 million general liability coverage for any Union umbrella policy placed over a primary policy.

Hull responds that it is entitled to summary judgment because Union has failed to show that either the reinsurance agreement or Underwriting Guidelines were part of a contract between Union and Hull, as Hull's contractual obligations arose solely from the Agreement, which failed to incorporate the reinsurance agreement or Underwriting Guidelines. Hull argues that Union's reliance on the reinsurance agreement fails because no provision of the Agreement imposes a duty on Hull to negotiate reinsurance for Union, and Union cannot incorporate other terms because the Agreement was fully integrated.

■  To establish a breach of contract under Iowa law, Union must prove the following:

> (1) the existence of a contract;  (2) the terms and conditions of the contract;  (3) that it has performed all the terms and conditions required under the contract;  (4) [Hull]'s breach of the contract in some particular way;  and (5) that [Union] has suffered damages as a result of the breach.

*Adam v. Stonebridge Life Ins. Co.,* 612 F.3d 967, 971 (8th Cir.2010) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998)).

■  "Interpretation is the process for determining the meaning of the words used by the parties in a contract. Interpretation of a contract is a legal issue unless the interpretation of the contract depends on extrinsic evidence." *Pillsbury Co. v. Wells Dairy, Inc.,* 752 N.W.2d 430, 435 (Iowa 2008) (internal citation omitted). "The cardinal rule of contract interpretation is to determine the intent of the parties at the time they entered into the contract. The most important evidence of the parties' intentions at the time of contracting is the words of the contract." *Peak v. Adams,* 799 N.W.2d 535, 544 (Iowa 2011) (internal citation omitted). "Another relevant rule of contract interpretation requires that wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." *Pillsbury Co.,* 752 N.W.2d at 436 (alteration, citation, and internal quotation marks omitted). "A term is ambiguous if, 'after all the pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.'" *Rick v. Sprague,* 706 N.W.2d 717, 723 (Iowa

2005) (quoting *Walsh v. Nelson,* 622 N.W.2d 499, 503 (Iowa 2001)). The Court finds no ambiguity in the Agreement.

In the Court's Order of December 19, 2011, denying Union's Motion to Compel Arbitration, the Court found that Union had not demonstrated that the Underwriting Guidelines had been incorporated by reference into the Agreement. That determination has not changed. Because it is now undisputed that the Underwriting Guidelines were not provided to Hull until late 2004—more than four years after Union and Hull entered into the Agreement—the Underwriting Guidelines could not have been part of the Agreement at the time Union and Hull executed the Agreement. Union argues, however, that the Agreement contemplated amendments to the Underwriting Guidelines by which Hull would be bound. The provision to which Union refers in support of its argument provides that "[i]t is further understood and agreed that Agency shall under no circumstances have authority to bind any risk for: (1) Any coverage when such authority has been restricted by submission or prohibited list published in the Agents Manual or any other written notice given to Agency." Agreement ¶ 1(A), Pl.'s App. 217, ECF No. 60–6. Union argues that, by its terms, the Agreement allows Union to restrict Hull from binding certain coverage when Union provides "any written notice" to Hull. *Id.*

The Court must disagree. The provision as written, with due regard to punctuation, and read in context of the entire Agreement, leads to the conclusion that the "written notice" must appear in a submission or prohibited list. Moreover, to read this provision as allowing Union to modify the applicable underwriting guidelines solely by a written notice would be inconsistent with the amendment procedures, which provide that "[u]nless both

[Hull] and [Union] agree in writing, any changes, modifications, revisions, deletion[s] or additions to this Agreement are prohibited." *Id.* ¶ 6(B), Pl.'s App. 219. An anomaly would result if the Court read the Agreement as providing for this amendment process, while also providing Union the ability to alter applicable underwriting guidelines by merely sending Hull a written notice. Because the Court is to interpret the contract as a whole, the Court finds that Union could not alter the applicable guidelines by merely providing a written notice to Hull. *See Rambo Assocs., Inc. v. S. Tama Cnty. Cmty. Sch. Dist.,* 487 F.3d 1178, 1184 (8th Cir.2007) (stating that under Iowa law, when interpreting a contract provision, the court must "give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning" (quoting *Home Fed. Sav. & Loan Ass'n of Algona v. Campney,* 357 N.W.2d 613, 617 (Iowa 1984))).

■ The Court is similarly unpersuaded by Union's argument that the reinsurance agreement between Westport and Union bound Hull by virtue of Hull's awareness of the provisions of the reinsurance agreement. Because Union cannot show that the reinsurance agreement was incorporated into the Agreement, Hull's mere awareness of the reinsurance agreement is an inadequate basis for the Court to find that the reinsurance agreement legally bound Hull. *See Hofmeyer v. Iowa Dist. Ct.,* 640 N.W.2d 225, 228 (Iowa 2001) (explaining that "clear and specific reference is required to incorporate an extrinsic document by reference").

Despite the skirmish over whether the Underwriting Guidelines were incorporated into the Agreement, the terse and general provision of those guidelines in relation to the matter before the Court would appear to add little. As Hull conceded at

the motion for summary judgment hearing, there is evidence in the record demonstrating that Hull at least knew there was an understanding that primary policies were required to have general liability limits of $1 million. Because the $1 million general liability limit is also all that the Underwriting Guidelines required, the Court will assume for purposes of summary judgment that Hull was contractually bound to place Union's umbrella policies above a primary policy with $1 million general liability limits.

█ Consistent with this general obligation either from Hull's operational understanding or assuming the application of the Underwriting Guidelines, Hull next argues that even if the Court were to find that the Underwriting Guidelines or reinsurance agreement bound Hull, Union cannot show that Hull violated the Underwriting Guidelines because the Underwriting Guidelines required Hull to place Union's policies over underlying policies with a minimum of $1 million in general liability limits per occurrence. Hull asserts it complied with this requirement because the assault or battery endorsement with a $500,000 sublimit does not alter the fact that there was a $1 million commercial general liability limit in the Mt. Hawley Policy. Relying on common knowledge in the industry, Union argues that the assault or battery endorsements reduced coverage on claims that would ordinarily be covered by primary policies, and therefore Hull breached its obligation of only placing Union commercial umbrella policies over primary policies with $1 million in general liability coverage.

On this record, the Court must find that Hull did not breach this obligation because the Mt. Hawley Policy did provide general commercial liability limits of $1 million per occurrence. While the assault or battery endorsements first excluded and then provided reduced coverage for certain occurrences, the Court notes that the Underwriting Guidelines and the Agreement are silent as to the existence of endorsements and exclusions in underlying policies, and there is nothing in the record that demonstrates a contractual provision, either express or implied, addressing endorsements or exclusions was otherwise agreed upon. *Cf. Grinnell Mut. Reinsurance Co. v. Jungling,* 654 N.W.2d 530, 537 (Iowa 2002) (concluding that the court would not read an insurance contract as excluding coverage for intentional acts when the contract did not contain any such a exclusionary provision but did affirmatively list other exclusionary provisions). Union and Hull are both sophisticated participants in the insurance industry and savvy to the potential existence of endorsements that could modify coverage, yet Union chose not to address those endorsements in its agreements with Hull that it submitted to the Court.[4] The Court cannot find, based on the "general framework" provided by the Underwriting Guidelines or an informal understanding between the parties, that inclusion of the assault or battery endorsement was in contravention of Hull's contractual obligations. Underwriting Guidelines, Baker Decl. Ex. B, Pl.'s App. 262. Therefore, even assuming the Agreement could be read to impose upon Hull an obligation to place the Union Policy above a $1 million general liability limit, the Court finds that Hull complied with this obligation.

█ Finally, in order to succeed on its breach of contract claim, Union is required

---

**4.** Union did obtain a level of protection from limiting endorsements by its requirements of the Thirsty Parrot. *See infra* pp. 961–62.

to show that Hull's alleged breach of contract caused damages. *See Adam*, 612 F.3d at 971. In the Union Policy, Condition K expressly provides that the Union Policy is "excess over **underlying insurance.**" Union Policy § IV—Conditions: K, Def.'s App. 177, ECF No. 61–3. Condition J provides, in part, that the Thirsty Parrot "will maintain the **underlying insurance** in full effect during the term of this policy without reduction of coverage or limits except for a reduction of limits solely by payment of damages because of **bodily injury, property damage, personal injury,** or **advertising injury,**" and that if the Thirsty Parrot "fail[s] to maintain the **underlying insurance,** this insurance shall not replace the **underlying insurance** but shall apply as if the **underlying insurance** was valid and collectible." *Id.* § IV—Conditions: J, Def.'s App. 176–77. "**Underlying insurance**" is defined in Definition T as "the insurance policies listed as Underlying Insurance, in the Declarations which provide the coverage and limits stated," and Definition T further provides that "[t]he coverage and limits stated in the Declarations for **Underlying Insurance,** and any renewals or replacements thereof, apply whether or not such is collectible." *Id.* § V—Definitions: T, Def.'s App. 181. Because the Union Policy declarations page provides limits of $1 million per occurrence, *see id.* at 163, the Court finds that Union had no obligation to provide coverage for liability not exceeding $1 million because, by its terms, the Union Policy provided that $1 million per occurrence in general liability limits applied whether or not that amount was collectible. Though the ultimate action of Union may have been a wise business decision, because the terms of the Union Policy did not require Union to drop down and cover the gap between $500,000 and $1 million, any payment by Union was a result of Union's decision to voluntarily provide coverage rather than as a result of a breach of contract by Hull. Accordingly, even assuming Hull breached a contractual obligation, the Court finds that Union cannot show damages.

## C. Duty to Indemnify

▉ Both parties seek summary judgment on Union's duty to indemnify claim. Union's duty to indemnify claim is based on the indemnification provision contained within the Agreement and the Underwriting Guidelines that Union argues was incorporated by reference into the Agreement.

The indemnification provision provides, in pertinent part, that

> Agency agrees to indemnify, defend and hold Company harmless against any liability which Company may sustain or incur directly or indirectly due to or arising out of any obligation, act, failure to act, or transaction created or done by the negligence of Agency ... in violation of, in excess of, or in contravention of the power and authority granted to Agency as set forth and described in this Agreement.

Agreement ¶ 8(D), Def.'s App. 6. In ruling on the breach of contract claim, however, the Court found that the Underwriting Guidelines were not incorporated by reference into the Agreement but assumed that a separate contractual obligation arose as a result of Hull's understanding that it needed to place Union policies over $1 million in primary general liability coverage. There is no indication, however, that this understanding would be incorporated by reference into the Agreement. Because Union is seeking indemnification on the basis of the Agreement, and "a claim for contractual indemnity must be covered by the contract," *McNally & Nimergood v. NeumannKiewit Constructors, Inc.*, 648 N.W.2d 564, 577 (Iowa 2002), the Court

having found that the Underwriting Guidelines were not incorporated into the Agreement is fatal to Union's duty to indemnify claim.

■■■ Even assuming that this dispute falls within the indemnification provision in the Agreement, Union's claim would still fail because Union cannot show that it was actually liable to the underlying claimant. Generally, to bring an independent action for indemnification, a party "must plead and prove three basic elements: (1) it was liable to the injured party, (2) the settlement was reasonable, and (3) the facts are such as to give rise to a duty on the part of the indemnitor to indemnify the indemnitee." *Ke–Wash Co. v. Stauffer Chem. Co.*, 177 N.W.2d 5, 11 (Iowa 1970).

The parties disagree about whether Union must establish actual liability in order to seek indemnification from Hull. The Iowa Supreme Court has explained, however, that "a party who seeks to establish a right to indemnity in an independent action must normally plead and prove it was liable to the injured party." *McNally*, 648 N.W.2d at 574. "The requirement to plead and prove liability established in *Ke–Wash* applies in independent actions for indemnity where the underlying claim for damages was settled without an adjudication of liability." *Id.* (citing *Ke–Wash*, 177 N.W.2d at 11–12). There is an exception to this rule "where there is an expressed agreement for indemnification providing otherwise." *Id.* at 575 (quoting *Ke–Wash*, 177 N.W.2d at 11).

Union relies on *Alliant Energy–Interstate Power & Light Co. v. Duckett*, 732 N.W.2d 869 (Iowa 2007), in support of its argument that Union must show actual liability only if the indemnification provision expressly requires Union to show actual liability. In *Duckett*, however, the court found that the general rule that an indemnitee must show actual liability did not apply because the tariff at issue "reveal[ed] it [did] not follow the traditional notion of treating indemnification as an obligation to indemnify the indemnitee against liability of the indemnitee to another or against a loss resulting from liability." *Id.* at 881. Therefore, *Duckett* explicitly reaffirmed the general rule that the indemnitee must show actual liability, but found the general rule did not apply because "the tariff eliminate[d] the [actual liability] element." *Id.* at 881. Accordingly, the Court finds that Union must show it was actually liable to the underlying claimant unless the indemnification provision in the Agreement reveals an intention that Union would be indemnified without actual liability.

■■■ Nothing in the indemnification provision suggests that Hull agreed to indemnify Union even if Union was not liable to the underlying claimant. To the contrary, the indemnification provision specifically provides indemnification "for any *liability*" which Union incurs. Agreement ¶ 8, Def.'s App. 6, ECF No. 61–3 (emphasis added). Therefore, the Court finds that the indemnification provision in this case requires Union to show that it was actually liable.

As explained above, the Court finds that Union was not actually liable to the underlying claimant because the Union Policy did not require Union to drop down and provide coverage for the gap between the assault or battery endorsement and the $1 million general liability limit. While Union initially argued that it was actually liable because its coverage counsel advised Union that it was likely obligated to provide coverage over $500,000 for assault or battery claims, to the contrary, as Union conceded at the hearing, the appropriate inquiry in this litigation has been whether Union *was* legally obligated to provide cov-

erage. The Court must conclude Union acted beyond its legal obligation.

Because the Court finds that Union was not actually liable, Hull is entitled to summary judgment on Union's claim for indemnification.

## III. CONCLUSION

For the reasons stated, Union's Motion for Summary Judgment, ECF No. 60, must be **denied,** and Hull's Motion for Summary Judgment, ECF No. 61, must be **granted.** The above-entitled action is **dismissed.**

**IT IS SO ORDERED.**